THE SCOTTISH AMERICAN INVESTMENT CO., LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

BRITISH ASSETS TRUST, LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SECOND BRITISH ASSETS TRUST, LTD., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 14289, 14290, 14291.   Promulgated January 27, 1949.

*Marion N. Fisher, Esq., D. Nelson Adams, Esq.*, and *F. Roberts Blair, Esq.*, for the petitioners.

*Jonas M. Smith, Esq.*, for the respondent.

**OPINION.**

KERN, *Judge* : In the earlier proceedings to which we have heretofore referred, the question presented was "whether or not petitioners are resident foreign corporations engaged in trade or business in the United States or having an office or place of business in the United States." [2] Those cases arose under section 231 (b) of the Revenue Acts of 1936 [3] and 1938.[4] We there held, the Fourth Circuit [5] and the

---

[2] 47 B. T. A., at page 475.

[3] SEC. 231. TAX ON FOREIGN CORPORATIONS.

       \*         \*         \*         \*         \*

  (b) RESIDENT CORPORATIONS.—A foreign corporation engaged in trade or business within the United States or having an office or place of business therein shall be taxable without regard to the provisions of subsection (a), but the normal tax imposed by section 13 shall be at the rate of 22 per centum instead of at the rates provided in such section.

  [4] (b) RESIDENT CORPORATIONS.—A foreign corporation engaged in trade or business within the United States or having an office or place of business therein shall be taxable as provided in section 14 (e) (1).

[5] 139 Fed. (2d) 419 ; *contra* (CCA–3), 142 Fed. (2d) 401.

Supreme Court [6] agreeing, "that during the taxable years [petitioners] had within the United States an office or place of business within the meaning of section 231 (b)  *  *  *." [7] We did not decide whether petitioners were engaged in business within the United States. [8]

The problem there left unanswered can not be avoided by us because of the amendment to section 231 (b) made by the Revenue Act of 1942. [9] We must decide whether, during 1942 and 1943, petitioners were "engaged in trade or business within the United States" and, therefore, are resident foreign corporations and entitled to the tax treatment accorded such corporations. The question before us is not whether any foreign investment trust can, under any circumstances, be considered as being engaged in business within the United States under the applicable code sections. It is, rather, whether these particular foreign investment trusts, petitioners herein, can be said, on the record before us, to be engaged in business within the United States, notwithstanding the following facts: All judgments as to investments, the purchase and sale of securities, and substantially all other major policy decisions were made by officers in the home office of the trusts situated outside of the United States; orders for purchase and sale of securities were executed by petitioners directly through resident banks in the United States; one of the principal purposes for the establishment of the American office was "to gain certain tax advantages"; and the American office's activities were, according to a realistic appraisal of the

---

[6] The Supreme Court (323 U. S. 119) affirmed the judgment of the Circuit Court of Appeals for the Fourth Circuit and reversed the judgment of the Circuit Court of Appeals for the Third Circuit. Because petitioners' returns for the years were filed with different collectors, the issue with respect to 1936 and 1937 went to the Fourth Circuit, and the issue with respect to 1938 and 1939 was appealed to the Third Circuit.

[7] 47 B. T. A., at page 483.

[8] The Supreme Court stated in this connection; "*  *  * The Tax Court and the two courts below did not pass upon the Commissioner's contention renewed before us, that the taxpayers were not 'engaged in trade or business' within the meaning of this section. We likewise do not discuss that claim here since it is sufficient if it be found that the taxpayers in this case had 'an office or place of business' in this country. See *B. W. Jones Trust* v. *Commissioner,* 4 Cir., 132 F. 2d 914, 917." However, it should be pointed out that the Circuit Court of Appeals for the Third Circuit in its opinion, 142 Fed. (2d) 401, at pages 402 and 403, used the following language in stating the factual background for its decision:

"The record clearly shows that the only real business of the corporations, namely, the investment business, consisting of the purchase and sale of securities with a view of disposing of unsatisfactory shares and reinvesting in others, was carried on in Edinburgh through the three boards of directors. They did everything of any importance in connection with these concerns, and it was as a result of their efforts that the income of the companies was produced. The so-called United States office functioned solely on routine matters. Most of these services had formerly been performed for the taxpayers by the custodian banks. The detail was extensive, of necessity, for the companies had millions invested in this country. That, however, gives no sound basis for finding that the United States office was the place for the regular transaction of the investment business of the corporations. The policy, management, buying and selling, were dictated from abroad. The actual buying and selling and custody of the securities were, as always, handled by the brokers and custodian banks.  *  *  *."

[9] SEC. 231. TAX ON FOREIGN CORPORATIONS
    *          *          *          *          *
(b) RESIDENT CORPORATIONS.—A foreign corporation engaged in trade or business within the United States shall be taxable as provided in section 14 (c) (1) and section 15.

evidentiary facts, confined to routine and clerical functions performed by the banks prior to 1936.[10]

Since our factual conclusions that all of the major decisions as to petitioners' businesses were made in Scotland and that the activities of the American office were confined to routine and clerical functions are crucial to our decision herein, some discussion in connection therewith is pertinent.

Petitioners, on brief, ascribe the following activities to the business of an investment trust: (1) The investment of funds, (2) the collection of income, (3) the exercise of voting rights, (4) the maintenance of records, (5) the obtaining of information, and (6) miscellaneous activities such as the preparation of tax returns. Petitioners concede that the determination of investment policies was made in Scotland. The record is clear that all decisions as to purchases and sales of securities were made by petitioners' directors or managing secretaries at their home offices, and orders in connection therewith were sent directly from Scotland to resident brokers in the United States. The Jersey City office was advised of these transactions so that it would make the proper entries on its books.

Before the establishment of the Jersey City office, the income of petitioners was collected by the banks. Afterwards, the dividends and interest on petitioners' investments (other than the interest on coupon bonds) were collected by that office, checked as to accuracy of amount, deposited in the bank accounts which it maintained, and remitted to petitioners in Scotland. Nothing in the record indicates that this was other than a routine operation.

With regard to the exercise of voting rights, the certified public accountant who acted as assistant secretary of petitioners in charge of the Jersey City office testified as follows:

Q Who had authority to deal with proxies received from corporations in whose shares the company had invested?

A Oh, as Assistant Secretary for each of those companies, the proxies came to my desk and I had to determine whether or not it was the best interests of the company to exercise or grant the proxy.

In some cases, where the thing was involved, I would give Edinburg an opportunity to express itself, but on quite a number of occasions they said "we merely leave it to your judgment," or rather in a few cases, because I didn't ask in too many cases. In a few cases in which I asked, they left it to my individual judgment.

Q Is it fair to state that you acted on proxies without, in the majority of cases, without consulting the head office?

A Oh, yes.

This quotation constitutes the entire record as to this activity incident to petitioners' business. We draw from it the conclusion that, with regard to the usual case in which no question appeared, proxies were

---

[10] See 323 U. S., at page 122.

acted upon by the assistant secretary, but with regard to cases in which a question appeared calling for the exercise of judgment as to policy, the matter was referred to the home offices; and in the latter case the home offices usually deferred to the recommendation of the assistant secretary.

The maintenance of records was obviously a routine and clerical activity. The same would be true concerning the information given to petitioners in Edinburgh "in order that they could make out their annual balance sheets and reports * * * to their security holders."

With regard to the obtaining of information, the record shows the testimony of the same witness to be as follows:

Q Did you send any other information, or make any other reports to the home office periodically?

A Oh, yes, we keep them fully informed as to the published material received in the Jersey City office from the companies whose stocks we own, whose bonds we own, and kept them informed as to stock dividends and stock rights, and information that appeared to us to be sufficient import to send along to Edinburg.

Bearing in mind that neither this witness (who was a certified public accountant), nor any other employee of petitioners' Jersey City office, was a business analyst or an investment counsellor, it would seem that information was forwarded to petitioners in the same routine way as that in which income was remitted.

The only "miscellaneous activities" specified were the preparation of tax returns, the leasing of the Jersey City office, and the payment of expenses, which are routine and, so far as the record shows, incidental activities.

We turn now from a consideration of the factual background of the question before us to a consideration of its legislative background.

The legislative history of the 1942 amendment, although not decisive, is illuminating. In the committee reports [11] it was stated:

Under existing law, nonresident aliens and foreign corporations are divided into two classes: (a) Those not engaged in trade or business within the United States and not having an office or place of business therein and (b) those engaged in trade or business within the United States or having an office or place of business therein. Those in class (a) are taxed at a flat rate on fixed and determinable income while those in class (b) are subject to tax at the corporate rate applicable to domestic corporations.

A tendency has arisen, principally on the part of foreign corporations which are substantial holders of the stock of domestic corporations and, occasionally on the part of nonresident alien individuals, to attempt to establish that they have an "office or place of business" within the United States and hence secure the very different tax treatment accorded taxpayers within class (b). Since such corporations and individuals engage in no other economic activities in the United

---

[11] House Ways and Means Committee Rept. No. 2333, 77th Cong., 2d sess., p. 103; Senate Finance Committee Rept. No. 1631, 77th Cong., 2d sess, p. 135.

States, they can not be said to be engaged in trade or business within the United States.

It appears to your committee to be in the interest of good administration to establish but one test (as is done with respect to capital stock tax in section 1200) in ascertaining the classification of foreign entities, namely, whether or not it is engaged in trade or business within the United States. Such amendment narrows sharply the field of uncertainty arising in such cases and removes a possible avenue of tax avoidance to large foreign corporate and other holders of domestic securities.

\* \* \* \* \* \* \*

It is apparent that the Congressional intent was that foreign corporations which held stock of American companies and engaged in no other economic activities were not to be encompassed within section 231 (b), since they were not engaged in trade or business in the United States.

At the time when this amendment was made, section 211 (b) of the code provided that a corporation could not be said to be "engaged in trade or business within the United States" if its only activities were "the effecting of transactions in the United States in stocks, securities, or commodities through a resident broker, commission agent, or custodian." In 1942, by the same act which amended section 231 (b), section 211 (b) was amended to read as follows:

\* \* \* Such phrase ["engaged in trade or business within the United States"] does not include the effecting, through a resident broker, commission agent, or custodian, of transactions in the United States in commodities (if of a kind customarily dealt in on an organized commodity exchange, if the transaction is of the kind customarily consummated at such place, and if the alien partnership or corporation has no office or place of business in the United States at any time during the taxable year through which or by the direction of which such transactions in commodities are effected), or in stocks or securities.

It seems quite clear, by virtue of the terms of section 211 (b) and the legislative history of the 1942 amendment to section 231 (b), that, but for the operation of the Jersey City office, petitioners could not fall within section 231 (b). Whether the establishment of such office and the activities there carried on are sufficient to change this result is a question not free from all doubt. But we believe, under the facts of these proceedings, that those activities are of themselves inadequate, and hence petitioners can not be considered as resident foreign corporations. It is true that language was used in prior opinions by way of *dicta* to the effect that the United States office "was used for the regular transaction of business"[12] and "performed vital functions in the taxpayers' investment trust business."[13] But these functions, although of such character and consequence as to permit the conclusion that the office was used for the regular and not casual transaction of

[12] 47 B. T. A., at page 483.
[13] 323 U. S., at page 124.

business, do not require and do not warrant the conclusion that the business of petitioners was carried on in the United States within the meaning of section 231 (b) as qualified by section 211 (b). Cf. *B. W. Jones Trust* v. *Commissioner* (CCA–4), 132 Fed. (2d) 914 (affirming 46 B. T. A. 531), with *Akiebolaget Separator*, 45 B. T. A. 243; affd., 128 Fed. 739; certiorari denied, 317 U. S. 661; and *Linen Thread Co.* v. *Commissioner* (CCA–2), 128 Fed. (2d) 166; certiorari denied, 317 U. S. 673. In our opinion, the real business of petitioners, the doing of what they were principally organized to do in order to realize profit,[14] was the cooperative management in Scotland of British capital, a large part of which was invested by them in American securities through transactions effected through resident brokers. To this business of petitioners, the business activities of the American office were merely helpfully adjunct. No consequential transactions were effected through or by the direction of the Jersey City office. It functioned primarily as a clerical department performing a number of useful routine and incidental services for petitioners. But it can not be said here that the local office, even though we look at its activities as a whole, was doing what was principally required to be done by petitioners in order to realize profit, or that its activities constituted a business which petitioners carried on within the United States.[15]

In cases such as these, it is a matter of degree, based upon both a quantitative and a qualitative analysis of the services performed, as to where the line of demarcation should be drawn. It is not so much the volume of the activities of the Jersey City office, although volume of activities may, in some cases, be a factor, but rather their character and the purpose for which the office is established that we believe are determinative. Cf. *McCoach* v. *Mine Hill & Schuylkill Haven Railway Co.*, 228 U. S. 295. We are not convinced that the services of this local office, quantitatively extensive and useful as they may have been, approached that quality which is necessary in order that petitioners can be characterized as having engaged in business in the United States during the years involved within the meaning of section 231 (b).

Another argument for this conclusion is the fact that the Congressional purpose for the 1942 amendment was not to broaden the area of section 231 (b), but rather to narrow it, and to close what was a "loophole" whereby foreign corporations which held stock in American companies could qualify as resident corporations merely

[14] To paraphrase language in *Edwards* v. *Chile Copper Co.*, 270 U. S. 452.

[15] The instant case is distinguishable from *Fernand C. A. Adda*, 10 T. C. 273; affd. 171 Fed. (2d) 457, in that in the cited case the purchases of commodities by the alien through brokers were made by a resident agent who was authorized to and did use his own discretion in effecting such transactions. See *Fernand C. A. Adda*, 10 T. C. 1291.

by establishing an office or place of business in this country, without the necessity of actually engaging in business in the United States.

Our conclusion, buttressed as it is by the specific provisions of section 211 (b) and the legislative history of section 231 (b), is consistent with the cases and other authorities construing the phrases "doing business" or "engaged in business" in the field of corporation law. We recognize that these can not be controlling of our question, although their helpfulness need not be entirely disregarded.[16] There, the problem frequently arises under various state constitutional and statutory provisions regulating out-of-state corporations. Such activities as the establishment of an office, performance of incidental transactions, the doing of acts relating solely to internal management, the appointment of an agent, and the acquiring or holding of stock in domestic corporations, have generally been held not to be sufficient to hold that the corporation is doing or engaging in business in the state. 20 C. J. S. Corporations, secs. 1828–1842; 17 Fletcher Cyc. Corporations, secs. 8464–8465, 8469–8470, 8472–8475, 8490, and the cases collated therein. Petitioners have done little, if anything, more.

Respondent's determination must be sustained.

Reviewed by the Court.

*Decisions will be entered for respondent.*

---

Opper, *J.*, dissenting: It seems to me impossible to reach the conclusion here enunciated and at the same time give effect to the decision by the Supreme Court in *Commissioner* v. *Scottish American Investment Co.*, 323 U. S. 119. The following language does not strike me as dictum, but was the reasoning by which the Court arrived at its determination on the only issue it was there called upon to consider:

* * * While decisions as to the purchase and sale of American securities were made in the Edinburgh offices, there was abundant evidence that the American office performed vital functions in the taxpayers' investment trust business. The uncontradicted evidence showed that this office collected dividends from the vast holdings of American securities and did countless other tasks *essential to the proper maintenance of a large investment portfolio* * * *. We cannot say that it was unreasonable for the Tax Court to conclude that this office * * * *was used for the regular transaction of business.* [Op. cit., pp. 124–125; emphasis added.]

The present facts as well as the present taxpayer were identical with those with which the Supreme Court was there dealing. If petitioner transacted business in an office within the United States as the prior

[16] Cf. Note, 40 A. L. R. 1451 ff: "Construction of the terms * * * as used in state statutes * * * may be of some aid in determining the meaning of the terms as used in the Federal Statutes considered here [capital stock tax], though these authorities are not directly in point, as they involve simply the question whether the corporation is 'doing business' at a particular place * * *." That is, in a sense, the question we have in these proceedings.

proceeding held and as the unmistakable language of the Supreme Court concluded, I fail to see how it is possible that it was not then and is not here transacting business within the United States. Since our present problem is confined to that limited issue, I respectfully dissent.

ARUNDELL, VAN FOSSAN, ARNOLD, DISNEY, and HARLAN, *JJ.*, agree with this dissent.