CONSOLIDATED PREMIUM IRON ORES LIMITED, ET AL.*, PETITIONERS,
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 47893, 54352, 54396.  Filed April 23, 1957.

*I. W. Sharp, Esq., Abe Fortas, Esq., Milton V. Freeman, Esq.*, and *Robert W. Sharp, Esq.*, for the petitioners.
*James F. Kennedy, Jr., Esq.*, for the respondent.

*Proceedings of the following petitioners are consolidated herewith: Wm. R. Daley and F. Cassie Daley, Docket No. 54352, and Cyrus S. Eaton, Docket No. 54396.

140

142

OPINION.

VAN FOSSAN, *Judge:* It is at once evident on the statement of the issues in these cases that respondent has taken two utterly inconsistent positions in his determinations. If Premium was liable for taxes on the bargain purchase of 1,437,500 shares of Steep Rock stock at 1 cent per share, as respondent originally held, the individual petitioners cannot also be liable—and vice versa. Confronted with this situation at the hearing, counsel for respondent elected to rely primarily on the individual liability of Eaton and Daley, the liability of the corporation being regarded as an alternative contention, an "anchor to windward" as it were. Petitioners contend that neither party is here liable—as to the individuals, Eaton and Daley, because they did not buy or receive the stock, made no assignment of the stock, and never acted in their individual capacity; and Premium, because it never engaged in trade or business in the United States and, if it earned income in the transaction, it is freed of tax liability to the United States by the Canadian-American tax treaty. We address ourselves first to the liability of the individuals.

Respondent's holding that Eaton and Daley earned compensatory income for their activity in promoting and financing Steep Rock and were liable in their individual capacity is predicated on his other contentions that Eaton and Daley acted as individuals throughout the entire transaction, that the excess in value of the Steep Rock stock was constructively received by Eaton and Daley as compensation for services rendered, was by them constructively assigned to Premium, that the corporate entity of Premium is to be wholly disregarded and the income, if any, is to be attributed to Eaton and Daley, individually. Respondent cites, as authority, *Lucas* v. *Earl*, 281 U. S. 111; *Helvering* v. *Horst*, 311 U. S. 112; and *Helvering* v. *Eubank*, 311 U. S. 122.

Petitioners contend that such a ruling constitutes a radical distortion and unwarranted extension of the cited cases; that Eaton and Daley neither bought nor received the stock either directly or indirectly; that the stock was never assigned by them to Premium either directly or constructively; and that Eaton and Daley acted at all times in their representative capacity and contemplated the realization of profits in the shape of dividends to be received in their capacity as stockholders in Otis and Premium.

We have found as a fact that in all their dealings and negotiations involved in the Steep Rock transaction, Eaton and Daley acted solely as agents and representatives of Otis or of Premium and not personally or in their capacity as individuals. Thus it is that the income, if any was earned in the bargain purchase of the shares of Steep Rock stock, was earned by Otis or by Premium.

Undoubtedly, Eaton and Daley performed valuable services for Premium and Steep Rock. It is also beyond question that they were impelled by the profit motive in the entire transaction—but so were Otis and Premium and so was Cleveland-Cliffs. It is one thing to be so motivated and another thing to realize a profit in a personal capacity.

Where a corporation acting through its officers or agents carries a business transaction to a successful and profitable fruition, prima facie the corporation earns the profit. Such is the usual posture in corporate dealings, and normally the corporation, and not the officers or agents or stockholders, is taxable on such profits. It is only in unusual cases and under special, distinguishing circumstances that the tax incidence o'erleaps the corporate structure and fixes upon the officers or agents or stockholders. We find no such distinguishing or unusual circumstances here.

True it is, that Eaton and Daley were active and aggressive in prosecuting the organization of Premium and financing the Steep Rock project. At times they wrote letters on behalf of the corporation in personal form, but this is not an exceptional or controlling fact. The use of the personal pronoun by a corporate officer or representative in

speaking of commitments or obligations of the corporation must be read in the light of the individual's practice and in keeping with the context of the immediate undertaking. When the instant record is so read, the true imputation is clear.

It is axiomatic that tax liability depends upon what in fact is done, not what might have been done. Eaton and Daley were businessmen with wide experience and strong and aggressive personalities. Undoubtedly they were aware of the nature, rights, and liabilities incident to corporate procedure. It is not too much to assume that they were conscious of the advantages taxwise of corporate as distinguished from individual liability. In the present day, one of the first considerations to be taken into account in almost any business deal is the incidence of taxes and the relative advantages taxwise of one procedure as against another. Nor is a taxpayer to be penalized for electing the legal or legitimate procedure that carries the least tax liability.

On examination of the sales contract between Premium and Steep Rock, it is at once evident that it was based on real and valuable considerations. The obligations which Premium assumed were important and vital to the development of the Steep Rock project. By no stretch of the imagination can the corporate entity of Premium be discounted as inconsequential or as anything else than an important party to the entire active program. Under the terms of the contract, Premium agreed to purchase the 1,437,500 shares of Steep Rock stock at 1 cent per share. It also undertook full responsibility as the sales agent for all the ore mined by Steep Rock; agreed to handle all the arrangements for the transportation of the ore and provide cargo insurance; was to be responsible for all collections on sales; agreed to advance $1,000,000 to Steep Rock in certain contingencies and to pledge 800,000 shares of Steep Rock stock as collateral; to maintain a net worth of $500,000 or to retain unencumbered, ownership of 500,000 shares of Steep Rock stock.

As above noted, we have found as a fact based upon the entire record that throughout the entire time and in all phases of the transaction, Eaton and Daley were acting as the representatives and agents of Otis and of Premium. The corollary of this finding is that in respect of any tax liability, if any exists, Otis and Premium were the taxable parties, not Eaton and Daley. *Herbert* v. *Riddell*, 103 F. Supp. 369; *Pat O'Brien*, 25 T. C. 376. The cases cited by the respondent, when properly read, do not suggest a contrary conclusion.

Addressing ourselves to the tax liability of Premium, petitioner contends that it is immune to taxation by the United States for two principal reasons: (1) That it is a foreign corporation and did not, in fact, engage in trade or business in the United States, and (2) that

it is a Canadian corporation without a "permanent establishment" in the United States, being accordingly shielded from the taxing authorities of the United States by the express terms of the Tax Convention and Protocol between the United States and Canada. Either reason if sustained would result in a decision for petitioner Premium as to this issue. We believe petitioner is on sound ground in both contentions.

Section 231 (b), Internal Revenue Code of 1939, as amended by the Revenue Act of 1942, provides that "[a] foreign corporation engaged in trade or business within the United States shall be taxable * * *."

The key clause in this provision is "engaged in trade or business." If the foreign corporation is not engaged in trade or business in the United States, it is taxable only on interest, dividends, rents, and certain other named items under the provisions of section 231 (a) (1), Internal Revenue Code of 1939, as amended.[1] We have found as a fact on the record that Premium was not engaged in trade or business in the United States. *Lewellyn* v. *Pittsburgh, B. & L. E. R. Co.*, 222 F. 177; *European Naval Stores Co., S. A.*, 11 T. C. 127; *Linen Thread Co., Ltd.*, 14 T. C. 725.

That the tax treaty or Tax Convention and Protocol between the United States and Canada stands as a bar to any tax liability of Premium is very clear. By the express terms of the treaty, the tax liability of a Canadian corporation depends upon whether or not that corporation has a "permanent establishment" in the United States. T. D. 5206, 1943 C. B. 526-528, 531-532, 535.[2] We have found as a fact that Premium did not have a permanent establishment in the

---

[1] SEC. 231. TAX ON FOREIGN CORPORATIONS.

    (a) NONRESIDENT CORPORATIONS.—

        (1) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year, in lieu of the tax imposed by sections 13 and 14, upon the amount received by every foreign corporation not engaged in trade or business within the United States from sources within the United States as interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of 30 per centum of such amount, except that in the case of corporations organized under the laws of any country in North, Central, or South America, or in the West Indies, or of Newfoundland such rate with respect to dividends shall be reduced to such rate (not less than 5 per centum) as may be provided by treaty with such country.

[2] SECTION 7.20. INTRODUCTORY.— * * *

ARTICLE I.

An enterprise of one of the contracting States is not subject to taxation by the other contracting State in respect of its industrial and commercial profits except in respect of such profits allocable in accordance with the articles of this convention to its permanent establishment in the latter State.

   *       *       *       *       *       *       *

ARTICLE II.

For the purposes of this convention, the term "industrial and commercial profits" shall not include income in the form of rentals and royalties, interest, dividends, management charges, or gains derived from the sale or exchange of capital assets.

   *       *       *       *       *       *       *

United States. This conclusive fact is very readily apparent on a study of the record.

Premium had no real office in the United States; no officers, directors, or employees here; no bank account or books of account; no telephone listing; its name did not appear on any door or office; it had no employee or agent established here who had "general authority to contract for his employer or principal," such authorized agent being one of the definitive tests of a "permanent establishment" under the treaty.

The term "permanent establishment" and the term "engaged in trade or business" both imply a place for carrying on a trade or business in the United States. Although the two terms are not synonymous, both relate to the same concept and imply the same general conditions. Thus it is that the observation of the court in *Lewellyn* v. *Pittsburgh, B. & L. E. R. Co.*, *supra*, and the tests there laid down are pertinent here. The court in that case stated:

---

ARTICLE III.

1. If an enterprise of one of the contracting States has a permanent establishment in the other State, there shall be attributed to such permanent establishment the net industrial and commercial profit which it might be expected to derive if it were an independent enterprise engaged in the same or similar activities under the same or similar conditions. * * *

\* \* \* \* \* \* \*

ARTICLE VIII.

Gains derived in one of the contracting States from the sale or exchange of capital assets by a resident or a corporation or other entity of the other contracting State shall be exempt from taxation in the former State, provided such resident or corporation or other entity has no permanent establishment in the former State.

\* \* \* \* \* \* \*

PROTOCOL.

3. * * * (f) the term "permanent establishment" includes * * * offices, agencies and other fixed places of business of an enterprise, but does not include a subsidiary corporation.

When an enterprise of one of the contracting States carries on business in the other contracting State through an employee or agent established there, who has general authority to contract for his employer or principal * * * such enterprise shall be deemed to have a permanent establishment in the latter State.

\* \* \* \* \* \* \*

Pursuant to section 62 of the Internal Revenue Code, Article XVIII of the convention, and other provisions of the internal revenue laws, the following regulations are hereby prescribed and all regulations inconsistent herewith are modified accordingly:

\* \* \* \* \* \* \*

SEC. 7.23. SCOPE OF CONVENTION WITH RESPECT TO DETERMINATION OF "INDUSTRIAL AND COMMERCIAL PROFITS" OF A NONRESIDENT ALIEN INDIVIDUAL, RESIDENT OF CANADA, OR OF A CANADIAN CORPORATION OR OTHER ENTITY CARRYING ON A CANADIAN ENTERPRISE IN THE UNITED STATES.—(a) *General.*—Article 1 of the convention adopts the principle that an enterprise of one of the contracting States shall not be taxable in the other contracting State in respect of its industrial and commercial profits unless it has a permanent establishment in the latter State. Hence, a Canadian enterprise is subject to United States tax upon its industrial and commercial profits to the extent of such profits from sources within the United States only if it has a permanent establishment within the United States. From the standpoint of Federal income taxation, the article has application only to a Canadian enterprise and to the industrial and commercial income thereof from sources within the United States. It has no application, for example, to compensation for labor or personal services performed in the United States nor to income derived from real property located in the United States nor to any interest in such property, including rentals and royalties therefrom, nor to gains from the sale or disposition thereof, nor to dividends and interest. Such enumerated items of income, to the extent covered by the convention, are treated separately elsewhere in these regulations and are subject to the rules laid down in the sections having specific reference to the respective items of income. * * *

Therefore the expression "engaged in business" means the same thing as "carrying on business," and the latter expression has the same meaning as "doing business." The three expressions, either separately or connectedly, convey the idea of progression, continuity, or sustained activity. "Engaged in business" means occupied in business; employed in business. "Carrying on business" does not mean the performance of a single disconnected business act. It means conducting, prosecuting, and continuing business by performing progressively all the acts normally incident thereto, and likewise the expression "doing business," when employed as descriptive of an occupation, conveys the idea of business being done, not from time to time, but all the time. * * *

The respondent contends, in effect, that the procuring of a license from the State of Ohio and the printing of a letterhead with the same address as Otis & Co., coupled with certain isolated acts of Eaton and Daley, demonstrate that petitioner had a "permanent establishment" in the United States. The fact is that petitioner made returns to the State of Ohio each year, stating that it had not done any business under the license in that year and, ultimately, surrendered the license. It is also clear that there was no agent or officer at such address authorized to do business for petitioner; that the only specific act of importance done by Daley at such office was the signing of the contract on behalf of Premium, when, recognizing that he had no authority to sign, he obtained from the Toronto office, by telephone, specific authority to execute such contract. The term "permanent establishment" normally interpreted suggests something more substantial than a license, a letterhead, and isolated activities. It implies the existence of an office, staffed and capable of carrying on the day-to-day business of the corporation and its use for such purpose, or it suggests the existence of a plant or facilities equipped to carry on the ordinary routine of such business activity. The descriptive word "permanent" in the characterization "permanent establishment" is vital in analyzing the treaty provisions. It is the antithesis of temporary or tentative. It indicates permanence and stability.

Numerous alternative plans were considered by the several parties which never matured into a definite program. Undoubtedly at one stage in the development of the program it was suggested and contemplated that Premium would develop a real establishment in Ohio, but this part of the plan was never implemented. The occasional use of a letterhead showing the Cleveland office of Otis & Co., is not sufficient. Necessary activities were handled through Otis & Co., with no special office or organization attributable to Premium. Premium paid Otis & Co. for "rent and services" of a Cleveland office, but the Commissioner does not argue strenuously that Premium really had any employees there. The services were actually performed for Steep Rock and reimbursement was originally sought from it. The payment by Premium for services actually not rendered to it does not

establish an office of Premium in Cleveland. Under the facts we cannot find that petitioner had a "permanent establishment" in the United States.

. Since Premium had no "permanent establishment" in the United States, to the extent that its income comes within the treaty, such income is free of taxation by the United States.

By the above holdings, we have disposed of all of the issues in these cases excepting a minor dispute as to the taxability of Premium for certain interest arising out of the loan of 45,000 shares of Steep Rock stock during each of the years 1944 through 1949. This item is not included in the tax-exemptive provisions of the Tax Convention. The record, however, as to this item is not sufficiently clear to justify an adequate findings of fact. Since the burden of proof in respect of the item rests on petitioner Premium, that corporation must bear the onus of failure of proof.

Respondent held that Premium should be penalized by an addition to the tax for tardy filing of its tax returns. The record shows that Premium was advised by competent experienced counsel that it had no tax liability to the United States and owed no duty to file returns. The considerations raised in this case well illustrate the difficulties involved in Premium's tax situation. Petitioner's delay in filing its tax returns was due to reasonable cause and not to willful neglect.

*Decisions will be entered under Rule 50.*