**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**SPERMACET WHALING & SHIPPING CO., S/A, Respondent.**

No. 13887.

United States Court of Appeals Sixth Circuit.

Aug. 10, 1960.

Meyer Rothwacks, Atty., Dept. of Justice, Washington, D. C. (Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Chief, Appellate Section, Tax Division, Dept. of Justice, and Harry Baum and George W. Beatty, Attys., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

Richard F. Stevens, Cleveland, Ohio (Charles D. Leist, Baker, Hostetler & Patterson, Cleveland, Ohio, on the brief), for respondent.

Before SIMONS, Senior Judge, and MILLER and O'SULLIVAN, Circuit Judges.

SHACKELFORD MILLER, JR., Circuit Judge.

The respondent, Spermacet Whaling & Shipping Co., is a corporation organized under the laws of the Republic of Panama. During the period of April, 1947, through the latter part of January, 1948, it participated in a fishing expedition for sperm whales and the production of sperm oil off the western coast of South America. It received from these operations during its fiscal year ending April 30, 1948, net income of $924,979.72. The respondent, as a foreign corporation, contends that not any of such net income is taxable to it by the United States. The Commissioner ruled otherwise and made a deficiency assessment of $351,492.29.

The facts are most interesting, but lengthy. They are set out in detail in the Findings of Fact and Opinion of the Tax Court, reported at 30 T.C. 618, to which reference is made. The following summary is sufficient for our present purposes.

Sperm oil is obtained from the sperm whale and is used for industrial purposes, primarily as an additive to lubricants. In 1946 sperm oil was in short supply, primarily because the Norwegian whal-

ing fleets had been depleted by enemy action during World War II, and because the whaling fleets then in operation were required to be used principally for the production of edible oils. Norway was the largest producer of whale oil in the world.

A typical whaling expedition to obtain crude sperm oil consists of a large mother or factory ship and a number of killer boats. The killer boats are used to catch the sperm whales and to tow them to the factory ship where the sperm oil is extracted. The operation is carried on without operational contact with a base station located in coastal waters.

Archer-Daniels-Midland Company, a Delaware corporation, hereinafter called A. D. M., was engaged in the business of purchasing, processing and selling certain special oils, including sperm oil. Because of the limited supply it faced a critical business need. Smith, its Executive Vice-President in Cleveland, Ohio, contacted Jahre, one of Norway's leading whalers, for the purpose of organizing a new whaling company to engage in the production of sperm oil. Jahre caused the Falkland Shipowners Limited, a British corporation, which he indirectly controlled, to acquire from the British Government an old factory ship called the Anglo Norse, which required a considerable expenditure of money to put it in suitable condition. He had at his disposal sufficient killer boats to outfit a whaling expedition. After considerable negotiations, Jahre, Smith and others, in December, 1946, caused the respondent to be incorporated under the laws of Panama. It held its first meeting of its board of directors in New York City on December 12, 1946.

Jahre returned to Norway and attempted to obtain for respondent a charter of the Anglo Norse from Falkland. Since Falkland was a British corporation, it could not execute such a charter to the respondent, a foreign corporation, without the approval of the British Government. The British Government refused to consent on the ground that Panama, the country of respondent's incorporation, had not subscribed to the International Whaling Agreement.

Jahre proposed that A. D. M. charter the Anglo Norse and then permit respondent to manage the sperm oil expedition, but A. D. M. refused to be a party to such an arrangement. After discussing the situation among themselves, respondent's Norwegian shareholders proposed to Smith that Smidas Company, Inc., hereinafter called Smidas, charter the vessel and then work out some definitive relationship with respondent for the conduct of the expedition. Smidas was an Ohio corporation, incorporated on February 19, 1945, engaged in promoting export business of certain technical items. At the time of its incorporation Smith acquired 54.5 per cent of its capital stock. After some negotiation, Smidas accepted the proposal. On or about February 4, 1947, a "bare boat charter party" was negotiated in Europe and there signed by Falkland as the owner of the Anglo Norse, by which Smidas chartered the vessel for a period of four years, with options to renew for further periods totaling six years, for $50,000.00 per annum.

By contract dated March 8, 1947, between Smidas and respondent, respondent assumed all of the obligations of Smidas under the charter party and agreed to organize, equip and manage the whaling expedition. It was to receive for its services and the obligations assumed, the proceeds to be received by Smidas from the sale of the oil, after deducting from such proceeds the sum of $25,000.00 and certain expenses incurred by Smidas in the sale and delivery of the oil.

By contract dated May 26, 1947, Smidas sold the sperm oil produced by the whaling expedition to A. D. M., with the provision that title to the sperm oil would pass to A. D. M. at the time that the sperm oil was delivered to A. D. M. in New York City.

The Anglo Norse was reconditioned and equipped for the contemplated expedition entirely in Norwegian shipyards, with the contracts therefor being

negotiated, executed, and carried out in respondent's behalf by Norwegians in Norway. All officers and all members of the crews of the several vessels, aggregating about 300 men, were Norwegian and were employed pursuant to contracts negotiated in respondent's behalf in Norway. Certain fuel oil purchases in the United States were arranged for by Smith at the direction of respondent's Norwegian management, to be delivered to the Anglo Norse off the western coast of South America.

The Anglo Norse and the seven killer boats left Norway on the sperm oil expedition in April, 1947, proceeded to the fishing grounds off the western coast of South America, where fishing for sperm whales and the production of sperm oil was commenced on May 20, 1947. These operations continued until about January 4, 1948, at which time the killer boats returned to Norway. During this entire period the vessels were in constant contact with respondent's management in Norway via shortwave radio and remained under Jahre's supervision.

About half of the sperm oil produced was delivered in October, 1947, to a transport which brought a load of fuel oil to the Anglo Norse, and after delivering the fuel oil received the sperm oil from the floating factory and delivered it to A. D. M. in New York. The balance of the sperm oil was delivered to A. D. M. in New York by the Anglo Norse about January 27, 1948. After unloading her cargo of sperm oil the Anglo Norse returned to Norway.

Respondent maintained a bank account at the Guaranty Trust Co. of New York, which it opened about February 8, 1947, with a deposit of $125,630.11. Deposits to that account included loans by shareholders and individuals to respondent and the money paid by A. D. M. for the purchase of the sperm oil in the amounts of $1,191,963.84 and $2,287,668.26 for the respective two deliveries, after proper provisions by A. D. M. for use of part of the proceeds to discharge lien indebtedness. The payments from that account consisted, in general of amounts paid at the direction of the Norwegian management to discharge obligations of respondent requiring payment in United States dollars, payments to or for the personal benefit of respondent's Norwegian shareholders (such payments being considered loans to those shareholders), repayment of loans, transfer of funds to Norwegian accounts for use by the Norwegian management, and for the payment of a tanker which was built and purchased in Europe and whose operations are not involved in this controversy. Smith acted as Treasurer of the respondent and in addition to drawing the checks on the Guaranty Trust Co. account maintained financial records in accordance with standard accounting practice.

Respondent did not at any time prior to April 30, 1948, have an office in the United States, nor was it qualified to do business in any state in the United States. It did not at any time have any United States employees. Smith was its sole officer in the United States. Respondent had an office in Norway, in which and from which it directed and managed its operations. Its board of directors held meetings in New York City on September 29, 1947, October 2, 1947, January 13, 1948, and February 2, 1948, to discuss and approve or ratify corporate procedures and policies. These meetings were called in New York City because it better suited the personal convenience of the directors to come there.

The basis for the assessment was the finding by the Commissioner that under the foregoing facts the respondent was a foreign corporation engaged in trade or business within the United States and that its gross income from the sperm oil expedition was from sources within the United States, thus making the net income taxable income to the respondent under the provisions of Section 231(b) and (c), Internal Revenue Code of 1939, 26 U.S.C.A. § 231(b).

On petition to the Tax Court for a redetermination of the deficiency, the Tax Court, with four judges dissenting, held that the respondent was not a resi-

dent foreign corporation engaged in trade or business within the United States and that its net income was accordingly not taxable as provided in Sections 14(c) (1) [1] and 15, Internal Revenue Code of 1939, 26 U.S.C.A. §§ 13, 15. The Commissioner seeks a review of the decision of the Tax Court.

There is no dispute about the foregoing basic facts, many of them being stipulated. From these facts the Tax Court found that the management contract between respondent and Smidas, and the sales contract between Smidas and the purchaser, A. D. M., were bona fide contracts serving a real business purpose, and were in fact what they appeared to be in form. It pointed out that Smidas was not a corporation organized for tax purposes, or for the particular part it played in this transaction. On the contrary, it had been in existence for some time, had ample assets and was at times engaged in various business activities. The Tax Court, recognizing the contract of sale between Smidas and A. D. M., said, "We think the facts here clearly show that petitioner was not the owner and seller of the oil."

■ The fact that the transaction took the form it did for the purpose of avoiding taxes, even if we assume such to be the case, is not sufficient to permit the Court to treat as taxable a transaction which in form is nontaxable, provided the component parts of the transaction are bona fide and not a sham. United States v. Cummins Distilleries Corp., 6 Cir., 166 F.2d 17, 20–21; Chamberlin v. Commissioner, 6 Cir., 207 F.2d 462, 468, certiorari denied 347 U.S. 918, 74 S.Ct. 516, 98 L.Ed. 1073; United States v. Cumberland Public Service Co., 338 U.S. 451, 455, 70 S.Ct. 280, 282, 94 L.Ed. 251. The Supreme Court stated in the Cumberland Public Service Co. case, "It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs. Here as in the Court Holding Co. case we accept the ultimate findings of fact of the trial tribunal." See also: United States v. Cummins Distilleries Corp., supra, 6 Cir., 166 F.2d 17, 20. Likewise, we accept the findings of the Tax Court in the present case that the contracts involved were bona fide ones, with the result that Smidas, not the respondent, was the owner and seller of the oil.

■ The Tax Court also found that "Upon the entire record, we are convinced that petitioner was not engaged in any substantial, regular, or continuous ordinary business activity in the United States." This is a finding of fact which we believe is not clearly erroneous and which we are required to accept.

■■ Based upon that finding, the Tax Court concluded that the taxpayer was not "engaged in trade or business within the United States" within the meaning of Section 231(b), Internal Revenue Code of 1939. Whether a foreign corporation is engaged in trade or business within the United States is a question of fact. Jan Casimir Lewenhaupt v. Commissioner, 20 T.C. 151, 162, affirmed, 9 Cir., 221 F.2d 227; Consolidated Premium Iron Ores, Ltd. v. Commissioner, 28 T.C. 127, 150, affirmed, without reference to this question, 6 Cir., 265 F.2d 320; European Naval Stores Co. v. Commissioner, 11 T.C. 127, 132; Scottish American Investment Co., Ltd. v. Commissioner, 12 T.C. 49, 54. The fact that the ultimate finding is a conclusion drawn from undisputed or established subsidiary facts does not change such a finding from one of fact to a conclusion of law. Being a finding of fact it is not to be set aside unless clearly erroneous. Section 7482, Internal Revenue Code of 1954, 26 U.S.C.A. § 7482; Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A.; United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746; Commissioner of Internal Revenue v. Consolidated Premium Iron Ores, Ltd., supra, 6 Cir., 265 F.2d 320, 326.

1. Now 26 U.S.C.A. § 13.

We recognize that there are a number of decisions in several of the circuits, including our own, which hold that where the subsidiary facts are undisputed and no question of credibility is involved, the Court of Appeals is as well qualified as the trial judge to draw inferences and conclusions therefrom, and such inferences and conclusions of the trial judge can be reviewed by the Court of Appeals free of the limitation of the "clearly erroneous" rule. Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389, 394; E. H. Sheldon & Co. v. Commissioner, 6 Cir., 214 F.2d 655, 658. However, in Rich v. Pappas, 6 Cir., 229 F.2d 308, 313, we concluded that in view of the ruling of the Supreme Court in United States v. United States Gypsum Co., supra, 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746, the conclusions of the trial judge, even though drawn from undisputed facts, were findings of fact which were not to be set aside unless clearly erroneous. We followed this new ruling, with one judge dissenting, in Dixie Sand & Gravel Corp. v. Holland, 6 Cir., 255 F.2d 304, 308, 314, and again in Commissioner of Internal Revenue v. Consolidated Premium Iron Ores, Ltd., supra, 6 Cir., 265 F.2d 320, 326. However, some members of the Court have been of the opinion that the rule as stated in the earlier Seagrave Corp. and E. H. Sheldon & Co. cases was the correct and better rule and have followed it in recent cases. Yunker v. Commissioner, 6 Cir., 256 F.2d 130, 133; Gudgel v. Commissioner, 6 Cir., 273 F.2d 206, 209–210.

■ The Supreme Court has very recently expressed its opinion in what we believe is an analogous situation. In Commissioner of Internal Revenue v. Duberstein, 80 S.Ct. 1190, 1194, decided June 13, 1960, the question presented was whether under certain facts and circumstances the transfer of a Cadillac automobile from one businessman to another constituted a "gift" within the meaning of the statute which excludes from the gross income of an income taxpayer "the value of property acquired by gift." The Court stated that decision of the issue must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case, that primary weight in this area must be given to the conclusions of the trier of fact, and although it may not satisfy an academic desire for precision in this area, the question remained basically one of fact, for determination on a case-by-case basis. The opinion states, "One consequence of this is that appellate review of determinations in this field must be quite restricted. * * * Where the trial has been by a judge without a jury, the judge's findings must stand unless 'clearly erroneous.' Fed.Rules Civil Proc. 52(a) * * *. *The rule itself applies also to factual inferences from undisputed basic facts, * * *,* as will on many occasions be presented in this area. * * * And Congress has in the most explicit terms attached the identical weight to the findings of the Tax Court. I.R.C. § 7482(a)." (Emphasis added.) The opinion refers to its previous ruling in United States v. United States Gypsum Co., supra, 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746, which we previously considered controlling in Rich v. Pappas, supra, 6 Cir., 229 F.2d 308, 313. Accordingly, in the present case, we construe the ultimate findings of the Tax Court, drawn from undisputed or established subsidiary findings, as findings of fact which are not to be set aside unless clearly erroneous.

■ In our opinion, the conclusions of the Tax Court that the respondent was not engaged in trade or business within the United States is not clearly erroneous and must be accepted on this review. As the Tax Court pointed out, the business in which respondent was engaged, treating the contracts between the parties as bona fide contracts serving a real business purpose, was that of managing the expedition for Smidas, and its activities which produced the income in question took place almost entirely on the high seas or in Norway. It was not, during some substantial portion of the taxa-

ble year regularly and continuously transacting a substantial portion of its ordinary business in the United States, which is a necessary requirement before a taxpayer can be found to be "engaged in trade or business within the United States." Lewellyn v. Pittsburgh, B. & L. E. R. Co., 3 Cir., 222 F. 177, 185–186; European Naval Stores Co. v. Commissioner, supra, 11 T.C. 127, 133; Scottish American Investment Co., Ltd. v. Commissioner, supra, 12 T.C. 49, 59; Linen Thread Co., Ltd. v. Commissioner, 14 T.C. 725, 736.

The decision of the Tax Court is affirmed.

SIMONS, Senior Judge (dissenting).

Out of the organization, operation and activities of the respondent in a whaling venture which resulted in very substantial profit, there emerged a tax controversy culminating in a determination by the petitioner of a deficiency in respondent's income tax return for the fiscal year ending April 30, 1948. The Tax Court held respondent's income from the venture not taxable, as provided in Sections 14(c) (1) and 15 of the Internal Revenue Code of 1939. The petitioner seeks review of that holding.

The controlling question is whether the respondent, during its taxable year, was a "resident * * * foreign corporation engaged in trade or business within the United States," as that phrase is used in Section 231(b) I.R.C. of 1939 as amended and whether the respondent, during the tax year, derived "gross income from sources within the United States," as that phrase is used in Section 231(c) I.R.C. of 1939. The Tax Court supported its conclusion by lengthy and detailed findings of facts and I accept the evidentiary facts as found. Whether they support the legal conclusion at which the Tax Court arrived is the heart of the controversy. I shall endeavor to summarize the facts as best I may.

The purpose of the venture was to obtain sperm oil, which is obtained from the sperm whale and is used for industrial purposes, primarily as an additive to lubricants. Norway was the largest producer of whale oil in the world and an American corporation styled Archer-Daniels-Midland Company, hereinafter referred to as ADM, was the largest refiner of sperm oil in the world. In 1946, sperm oil was in short supply, primarily because the Norwegian whaling fleets had been depleted by enemy action during World War II and because whaling fleets then in operating condition were required for other purposes. Werner G. Smith, a citizen of the United States residing in Cleveland, was a director and executive vice president of ADM. He was its highest paid officer and was in charge of the division of its business known as the Werner G. Smith Company. This had been owned and operated by Smith independently but had been absorbed by ADM with Smith remaining in an executive capacity. The nature of its business required that ADM make long time commitments to its customers and so it sought to maintain large inventories and to establish assured sources of supply. During the period here involved, there was a great demand for sperm oil and a limited supply because of which ADM faced a critical business need. In an effort to meet it, Smith contacted two Norwegian citizens by the names of Hans Bull Ovrevik and Magnus Konow. Hans Bull, as Ovrevik was known, was a broker in sperm oil and Konow was a shipowner and a former manager of a Norwegian whaling company.[1] These individuals, in turn, approached Anders Jahre, one of Norway's leading whalers, to inquire whether he would be interested in organizing a new whaling company to engage in the production of sperm oil. They indicated that they would like to join Jahre in such a venture and that Smith in the United States would be interested, if by that method he could secure sperm oil for ADM. Jahre was willing to organize a

1. Konow later retired from the project.

company but suggested that it would be necessary first to secure a suitable factory ship.

Thereafter, Jahre caused the Falkland Shipowners Limited, a British corporation which he controlled, to acquire from the British government an old factory ship called the "Anglo Norse." Jahre had at his disposal sufficient "killer boats" to outfit a whaling expedition. On June 22, 1946, Jahre prepared a memorandum which he circulated among the parties interested in the proposed whaling expedition and, as a result, Smith went to Europe, met with the others in Norway, where a memorandum was initialed which provided that an operating company be formed, that the capital stock of the company ($200,000.00) be subscribed 40% by Smith and 60% divided among the others; that the stockholders would lend the company $200,-000.00 in proportion to their stockholdings, that a syndicate be formed composed of the stockholders, that the entire production of sperm oil by the operating company would be sold to the syndicate, and then resold to the Smith Division of ADM, and that ADM would lend the new company up to $500,000.00. Upon Smith's return to the United States, he discussed the proposed agreement with his attorney, Clayton A. Quintrell, who objected to the syndicate arrangement and it was abandoned.

Meanwhile, the price of sperm oil in the world markets had increased substantially and the labor and reconversion of the Anglo Norse found to cost more than anticipated so the Norway parties advised that oil could not be sold to ADM for $280.00 per ton. After consulting with the president of ADM, Smith indicated to the Norwegians that ADM would be willing to pay $320.00 per ton. Early in December, Jahre, Bull and Smith met in New York City and caused the respondent to be incorporated under the laws of the Republic of Panama. Jahre, Bull and Smith became its directors. They held their first meeting in New York City. The Tax Court found that Smith made his investment in the respondent in order to obtain an adequate supply of sperm oil for ADM.

At the first meeting of the directors, Jahre, acting for the respondent in New York, signed a sales contract between the respondent, as seller, and ADM, as buyer. While this contract provided that title to all sperm oil produced by respondent should pass to ADM upon the placing of oil in the tanks of the factory vessel, the proposed sales contract was never signed by ADM and never had operative effect. Shortly thereafter, on December 12, 1946, Jahre, in Norway, sought to formalize an arrangement with respect to the "Anglo Norse" by obtaining a charter for the ship from Falkland. Since the latter was a British corporation, it could not execute such charter to a foreign corporation without the approval of the British Government. The latter refused its consent on the ground that Panama had not subscribed to the international whaling agreement.

This decision jeopardized the entire sperm oil venture. Jahre first proposed that ADM charter the "Anglo Norse" but ADM refused to be a party to such arrangement. The respondent's Norwegian shareholders then proposed to Smith that the Smidas Company, Inc. charter the vessel and work out some relationship with the respondent for the conduct of the expedition. Smidas accepted the proposal.

This is the first reference to Smidas in the court's factual narrative and I digress for a moment. Smidas is an American export corporation, formed in 1945. Smith owned 54.5% of its stock acquired at its incorporation and was also its Secretary-Treasurer. Its business was to promote exports of certain technical items and its income was derived from commissions and fees. Nothing in the findings indicates that Smidas was active, or even interested in sperm oil, or that it participated in any way in the organization of the respondent. It was, however, available to Smith by reason of his controlling interest. There is no evidence or finding that Smidas contributed anything to the organization

of the respondent, or received any part of the purchase price from ADM.

I return to the Tax Court's narrative. Smidas authorized a contract to be signed by Smith, as its Secretary-Treasurer, to charter the "Anglo Norse" and it was chartered on or about February 5, 1947, in its name. During the fiscal year, various credit arrangements were worked out by the respondent. Jahre negotiated for it a credit of 300,000 British pounds from Lazard, a London banker. Additional loans were obtained from respondent's stockholders and from ADM in order to carry on operations. While, on February 21, 1947, a contract was entered into between respondent, as seller, and ADM, as buyer, of the oil to be produced, it was later rescinded when Smith's attorney, Quintrell, pointed out that Smidas and not respondent was to be the legal owner of the oil. Two new contracts were thereafter drawn * * * one between the respondent and Smidas, on March 8, 1947, and a sales contract between Smidas and ADM, dated May 26, 1947. Under the first, respondent was to manage the operations, furnish the "killer boats," hire personnel, pay all expenses and insurance, assume all the obligations of Smidas, and exonerate Smidas from liability relating to the whaling operations. Smidas, in turn, was to enter into a contract with ADM to sell it all the oil produced at $320.00 per ton and to pay the entire proceeds to respondent for services and for undertaking the burdens, expense and risks, less $25,000 which it would retain along with any selling expenses. The sales contract between Smidas and ADM provided that title pass in New York City upon the delivery of the oil.

The venture was launched. "Killer ships" were acquired, crews hired and repairs on the "Anglo Norse" made. Smith, in the United States, arranged for fuel to be delivered to the ships while at sea. The expedition began in April, 1947, and operations continued in South American fishing grounds until about January 4, 1948. The operations under Jahre's supervision produced 15,357 tons of sperm oil. Part of the oil was delivered to ADM at New York City by private transport, in October, 1947, at which time ADM paid the purchase price of $2,622,343 in the following manner: $1,429,900 was paid by ADM directly to the banker, Lazard, to discharge its lien and the balance was deposited by ADM to the respondent's account with the New York Guaranty Trust Company. On January 27, 1948, the "Anglo Norse" delivered the rest of the oil to ADM in New York and the purchase price of $2,287,668 was deposited in the New York bank account of the respondent. This account had been opened in order to pay the respondent's obligations in the United States. Another account had also been opened in a Norwegian bank. Smith could make withdrawals from the New York account but orally agreed to first secure approval by the Norwegians. All books and records, other than those involved in the New York bank account, were kept in Norway. Four directors' meetings were held in New York City and several informal meetings in Norway.

The respondent reported net income of $810,576.38—later adjusted to $924,979.72—for the fiscal year but denied tax liability on it. The Commissioner determined a deficiency of $351,492.29. The Tax Court, however, held there was no deficiency, since Smidas was the owner of the oil sold to ADM in New York and respondent was not engaged in any substantial, regular, or continuous business activity in the United States. Four judges of the Tax Court dissented, taking the view that in reality respondent conducted the whole whaling operation and Smidas was its "mere agency or instrumentality."

The question to be determined was whether the respondent was "engaged in a trade or business within the United States" as defined in Sec. 231(b) of the 1939 Internal Revenue Code, (26 U.S.C. 1952 ed.) which reads:

"(b) Resident corporations. A foreign corporation engaged in trade or business within the United

States shall be taxable as provided in Section 13 and Section 15."

Most of the activities cited by the petitioner as having taken place within the United States were, in the opinion of the Tax Court, without substance including the arrangement for the discharge of the oil when it was delivered in New York, the legal services performed by Quintrell, his position as assistant secretary of the respondent, payment of obligations required to be paid in American dollars out of the bank account with the Guaranty Trust Company, or the holding of directors' meetings in New York. They were considered by it as ministerial and clerical in nature, involving little exercise of discretion or business judgment necessary to the production of the income in question. The holding of directors' meetings in New York were solely, it was said, for the personal convenience of the directors, with no particular consequence in any major aspect.

The Court reasoned that the fact that the whaling enterprise was under the management of the respondent at the time the oil was delivered was not enough to require a holding that the respondent was engaged in trade or business within the United States. It contended that to be engaged in trade or business within the United States the taxpayer must, during a substantial portion of the taxable year, have been regularly or continuously transacting a substantial portion of its ordinary business in this country, and this the respondent did not do. The respondent is, therefore, not a resident foreign corporation engaged in trade or business within the United States and not taxable as provided in Sections 14(c)(1) and 15 of the Internal Revenue Code of 1939.

The four dissenting Tax Court judges disagreed. They relied upon holdings wherein the Supreme Court has repeatedly taken the position that the incidence of taxation depends upon the substance of a transaction and not its form. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981, and Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 278, 84 L.Ed. 319. They relied on the observation of the Supreme Court in the latter case: "We cannot too often reiterate that 'taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed, the actual benefit for which the tax is paid' " and on the reasoning of the Supreme Court in Corliss v. Bowers, 281 U.S. 376, 378, 50 S.Ct. 336, 74 L.Ed. 916. The dissenters deemed it clear that in reality the respondent conducted the whole whaling operation and the sale of the oil and that Smidas was a "mere agency or instrumentality" used by the respondent for chartering the "Anglo Norse." They point out that the respondent assumed all the obligations of Smidas under the charter party, procured the "killer boats," outfitted each vessel, hired all necessary personnel, procured the insurance, conducted the whaling operations, paid all expenses, delivered at least a part of the oil and directly received the proceeds from the sale of the oil. Whereas, in form, the contract provided that the respondent would manage, finance and operate the expedition for Smidas, the respondent received payment of the entire proceeds from the sale of the oil except $25,000 which would be retained by Smidas. In reality, it was the respondent which received all the proceeds and paid Smidas for what appears to have been merely entering into the charter agreement. All the oil was sold in the United States and since the delivery and sale of products are the most important functions of a business for profit, it is clear that the respondent was engaged in trade or business within the United States within the meaning of Section 231(b) of the Internal Revenue Code of 1939 and, therefore, taxable upon income from sources within the United States.

I agree with the reasoning of the dissenting judges. To it, I may add that the whole enterprise was a unified venture by which Smith, as the dominating

spirit, sought and succeeded in obtaining sperm oil for ADM without which the economic status of ADM would be greatly jeopardized. To this end, Smith interested the Norwegian whaling interests and when faced by an impasse in respect to the charter of the "Anglo Norse," and after refusal of ADM to act as the charter party, secured the assistance of one of his own corporations, Smidas. The result was the delivery of processed oil finally to ADM though preliminary agreements indicated a differing program, directed to the same end. It is idle in considering what is meant by being "engaged in trade or business within the United States" to submit an enterprise to the test of whether the activity is normal, regular, or continuous in other enterprises in ordinary times. By its very nature, the present venture contemplated a "one shot" operation with substantial profits envisioned by the unusual circumstances that existed in an abnormal time.

We had occasion in Commissioner of Internal Revenue v. Ashland Oil & R. Co., 6 Cir., 99 F.2d 588, 591, to study the problem of the relationship between form and substance in tax cases in a different environment, where we concluded that: "The question remains, however, whether if the entire transaction, whatever its form, was essentially in intent, purpose and result, a purchase by Swiss of property, its several steps may be treated separately and each be given an effect for tax purposes as though each constituted a distinct transaction. * * * the courts have recognized that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority."

It is true that we are dealing with just one sale involving two deliveries of oil to the United States. It must be noted that the transaction in the United States was the culmination of all of the respondent's business activity. It involved an expedition which was at sea for over nine months, produced 15,357 tons of sperm oil, a purchase price of over three million ($3,000,000) dollars, and a net income of $924,979.00. These end results were brought about by the sale in the United States which accounted for over 90% of respondent's total income for the tax year. I conclude that all activities ending in the resulting sale in the United States constituted the respondent being engaged in trade or business within the United States under Section 231(b) I.R.C.

I believe the decision should be reversed and the cause remanded for a determination of the amount of income attributable to sources within the United States within Section 231(c) I.R.C.