SPERMACET WHALING & SHIPPING CO. S/A, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54931. Filed June 13, 1958.

*Clayton A. Quintrell, Esq.*, and *Charles D. Leist, Esq.*, for the petitioner.

*Frank W. Hardy, Esq.*, for the respondent.

ARUNDELL, *Judge:* Respondent determined a deficiency in income tax for the taxable year ended April 30, 1948, in the amount of $351,492.29, all of which is in controversy. The issues to be decided are:

(1) Was petitioner, during the taxable year, a "resident * * * foreign corporation engaged in trade or business within the United States" as that phrase is used in section 231 (b), I. R. C. 1939, as amended?

(2) Did petitioner, during the taxable year, derive "gross income from sources within the United States" as that phrase is used in section 231 (c), I. R. C. 1939?

(3) In the event issues (1) and (2) are decided against petitioner, did respondent err in not applying section 119 (e) (2), I. R. C. 1939, and section 29.119–12 of Regulations 111?

A fourth issue raised in the petition concerning section 231 (d), I. R. C. 1939, as amended, has been waived by petitioner.

FINDINGS OF FACT.

Some of the facts are stipulated. To the extent such stipulated facts are not set out herein, they are nevertheless found as facts and are incorporated herein by reference.

Petitioner is a corporation organized and existing under the laws of the Republic of Panama and at all times pertinent hereto had issued and outstanding 2,000 shares of its capital stock. It was originally incorporated as Spermacet Whaling Co. S. A. but in 1954 its name was changed by appropriate corporate action to Spermacet Whaling & Shipping Co., S. A.

Petitioner's books of account are maintained on an accrual basis and on the basis of a fiscal year ending April 30. Its Federal income tax return for the fiscal year ended April 30, 1948, was filed [1] on June 13, 1951, with the then collector of internal revenue at Cleveland, Ohio.

Archer-Daniels-Midland Company (hereinafter called A. D. M.) is a Delaware corporation with its principal office in Minneapolis, Minnesota. At all times pertinent hereto, it was engaged in the business of processing grains, seeds, and cereals, buying and selling various types of vegetable and other oils, and of conducting related manufacturing and processing operations. During the period from 1946 to 1948, inclusive, Werner G. Smith, a citizen of the United States and a resident of Cleveland, was a director and executive vice president of A. D. M. He was the highest paid officer of A. D. M. and was in charge of that division of its business known as the Werner G. Smith Company (hereinafter called Smith Division of A. D. M.). Many years before, this company had been owned and operated by Smith independently of A. D. M. but had been absorbed by that corporation, and Smith remained in an executive capacity. During the taxable year, the Smith Division of A. D. M. had its headquarters in Cleveland and was engaged in the business of purchasing, processing, and selling certain special oils, including sperm oil.

Sperm oil is obtained from the sperm whale and is used for industrial purposes, primarily as an additive to lubricants. It is to be distinguished from the edible oils produced from baleen whales.

In 1946, sperm oil was in short supply, primarily because the Norwegian whaling fleets had been depleted by enemy action during World War II, and because the whaling fleets then in operating condition were required to be used principally for the production of edible oils. At this time, as had been true for many years, Norway was the largest producer of whale oil in the world.

A typical whaling expedition to obtain crude sperm oil consists of a large mother or factory ship and a number of killer boats. These vessels customarily engage in pelagic whaling, which means deep-sea fishing in the open seas without operational contact with a base station located in coastal waters. The killer ships are used to catch the sperm whales and to tow them to the factory ship. After the whales have been hauled aboard the larger vessel, the sperm oil is extracted, partially from a cavity in the head of the sperm whale and partially

---

[1] Attached to this return was a statement saying in part: "This return is filed * * * to obviate the possibility of the preparation and filing of such a return by either the Collector or Commissioner pursuant to Section 3612 IRC. * * * Such filing shall in no way be construed as an admission that the corporation has any place of business, office or situs or was during such years engaged in trade or business within * * * the United States. * * * The filing * * * shall not be deemed an admission of any liability to taxation by the corporation which expressly denies all liability therefor with respect to the income so reported."

by a cooking and refining process applied to the blubber and meat of the whale. Only the sperm liver (from which vital products are obtained) and the sperm oil, which is stored in large tanks on the mother ship, are preserved. Any sediment remaining after the cooking and refining process is discarded.

In the period from 1946 to 1948 A. D. M. was the largest refiner of sperm oil in the world. Neither it nor Smith, however, had any experience in whaling, nor had they ever participated in the operation of a sperm-whaling expedition. Instead, A. D. M.'s business consisted of buying crude sperm oil from the initial producer, refining it, and selling it to others for industrial use. The nature of its business was such that it was required to make long-term commitments to its customers and, as a consequence, it in turn sought to maintain large inventories of sperm oil and to establish assured sources of supply.

During this period from 1946 to 1948, there was a great demand for sperm oil. Of all the nations, Germany had the greatest demand and England likewise was a very large buyer. During this period nearly every country in Europe was interested in buying sperm oil.·

Because of this great demand for sperm oil, coupled with the limited supply due to World War II, A. D. M. faced a critical business need. In an effort to meet this need, Smith contacted two Norwegian citizens by the names of Hans Bull Ovrevik and Magnus Konow. Hans Bull (as Ovrevik was known) was a broker in sperm oil, and Konow was a shipowner and a former manager of a large Norwegian whaling company. These individuals in turn approached Anders Jahre, one of Norway's leading whalers, and inquired whether he would be interested in organizing a new whaling company to engage in the production of sperm oil. They indicated that they would like to join Jahre in such a venture and that Smith, in the United States, would be interested if by that method he could secure sperm oil for A. D. M. Jahre was willing to organize such a company but suggested that it would be necessary first to secure a suitable factory ship.

Shortly thereafter Jahre caused the Falkland Shipowners Limited (hereinafter called Falkland), a British corporation which he indirectly controlled, to acquire from the British Government an old factory ship called the *Anglo Norse*. This ship had been converted to a tanker during World War II and required considerable work and capital to reconvert it into a factory ship. Jahre had at his disposal sufficient killer boats to outfit a whaling expedition.

On June 22, 1946, Jahre prepared a memorandum which he circulated among the parties interested in the proposed whaling expedition, including Smith, Bull, Konow, and one Anton Von der Lippe who was a citizen and resident of Norway and a close friend of Jahre's. As a result of this memorandum, Smith went to Europe and met with Jahre, Bull, Konow, and Von der Lippe in Tonsberg, Norway, on

July 4, 1946. At this conference the parties initialed a memorandum captioned "Proposed Agreement regarding Production of Sperm Oil and sale of Sperm Oil to the [Smith Division of A. D. M.]." Among other things, this proposed agreement provided that an operating company be formed; that the capital stock of the company ($200,000) be subscribed 40 per cent by Smith and 60 per cent divided between Jahre, Bull, Konow, and Von der Lippe; that the stockholders would also lend the company $200,000 in proportion to their stockholdings; that a syndicate be formed composed of the same stockholders; that the entire production of sperm oil by the operating company would first be sold to the syndicate and then resold by the syndicate to the Smith Division of A. D. M.; and that A. D. M. would lend the new company up to $500,000 for the purpose of enabling it to pay for provisions, fuel, wages, and similar items.

When Smith initialed the proposed agreement of July 4, 1946, he advised the other parties that he did so with reservations and would not consider himself bound until he had discussed it with his attorney Clayton A. Quintrell, of Cleveland, Ohio.

Upon Smith's return to the United States, he discussed the proposed agreement of July 4, 1946, with Quintrell. The latter objected to the syndicate arrangement, and these objections were later accepted by the parties interested in organizing the proposed operating company.

During the period from July 4, 1946, to about December 1, 1946, the price of sperm oil in the world market increased substantially. In view thereof and of the fact that Jahre and the other Norwegian interests began to realize that the repair and reconversion of the *Anglo Norse* would cost considerably more than previously anticipated, they advised Smith from Norway that the sperm oil to be produced upon the proposed expedition could not be sold to A. D. M. for $280 per ton. After consulting with the president of A. D. M., Smith finally indicated to the Norwegians that A. D. M. would be willing to pay $320 per ton. Prior to December 1, 1946, all the Norwegian interests except Konow had agreed from Norway to accept the new price. Konow thereafter withdrew from any further participation in the venture.

Early in December 1946, Jahre, Bull, and Smith met in New York City and thereafter, on December 11 and 12, 1946, caused the petitioner to be incorporated under the laws of the Republic of Panama with the assistance of the law firm of Arias and Arias of Panama City, Panama. One of the reasons for causing petitioner to be incorporated in Panama was the hope of saving taxes.

Under petitioner's articles of incorporation, it was authorized to engage in the whaling and shipping industries with an authorized capital stock of 5,000 common shares without par value. Panama was fixed as the domicile of the corporation and the law firm of Arias and Arias of Panama City was named as its resident agent in Panama.

The articles also provided that petitioner's initial board of directors would consist of Jahre, Bull, and Smith and, on the afternoon of December 12, 1946, they held their first board of directors' meeting in New York City.

Petitioner's capital stock was issued 40 per cent to Smith and 60 per cent to citizens and residents of Norway, and loans were made to petitioner in the same proportion, as more fully appears in the schedule below:

| Shareholder | Capital stock stated in dollars | Shares | Percentage ownership | Loans stated in dollars |
|---|---|---|---|---|
| Smith | $80,000 | 800 | 40 | $80,000 |
| Jahre | 50,000 | 500 | 25 | 50,000 |
| Bratt | 30,000 | 300 | 15 | 30,000 |
| Von der Lippe | 10,000 | 100 | 5 | 10,000 |
| Bruun | 10,000 | 100 | 5 | 10,000 |
| Bull | 20,000 | 200 | 10 | 20,000 |
| Total | 200,000 | 2,000 | 100 | 200,000 |

Smith made his investment in petitioner in order to obtain an adequate supply of sperm oil for A. D. M.

In accordance with authority vested in him at the first meeting of the board of directors, Jahre (acting in petitioner's behalf) signed on December 12, 1946, in New York City, a proposed sales contract between petitioner as seller and A. D. M. as buyer. Among other things, this contract provided that title to all sperm oil produced by the seller during the period of production "shall pass to and vest in the Buyer immediately upon the placing of such oil in the tanks of the said floating factory wherein it is produced by the Seller." For reasons hereinafter stated, this proposed sales contract was never signed by A. D. M. and never had any operative effect.

Shortly after the meeting of petitioner's board of directors in New York City on December 12, 1946, Jahre returned to Norway. Pursuant to the authority conferred upon him, he sought to formalize the prior arrangement existing with respect to the *Anglo Norse* by obtaining a charter for petitioner from Falkland. Since the latter was a British corporation, however, it could not execute such a charter to petitioner, a foreign corporation, without the approval of the British Government. When contacted, the British Government refused its consent on the ground that Panama (the country of petitioner's incorporation) had not subscribed to the International Whaling Agreement,[2] a treaty to which both Great Britain and the United States were parties.

---

[2] The International Whaling Agreement was a convention between certain countries governing the length of the whaling season, the size of the whales which could be caught, and similar considerations. There was an understanding between the signatories to the agreement that they would not permit their nationals to charter vessels to nationals of nations which had not subscribed thereto.

The decision of the British Government jeopardized the entire sperm oil venture contemplated by petitioner's shareholders. Jahre first proposed that A. D. M. charter the *Anglo Norse* and then permit petitioner to manage the sperm oil expedition which had been planned, but A. D. M. refused to be a party to such an arrangement. After discussing the situation among themselves, petitioner's Norwegian shareholders proposed to Smith that Smidas Company, Inc.,[3] (hereinafter called Smidas) charter the vessel and then work out some definitive relationship with petitioner for the conduct of the expedition. After some negotiation, Smidas accepted the proposal.

On February 5, 1947, Smidas authorized Bull in Norway to charter the *Anglo Norse* in its behalf and to execute a supplemental charter contract in connection therewith. The authorization to Bull was signed "SMIDAS INC by Werner G. Smith Secretary Treasurer." Pursuant to the authority thus conferred by Smidas, a "bare boat charter party" was negotiated in Europe on or about February 5, 1947, and was there signed by Falkland as the owner of the *Anglo Norse*, and by Bull, acting for Smidas, as charterers. On or about February 5, 1947, a supplemental contract was also entered into between Falkland and Smidas. This contract was also signed by Jahre and Bull, acting for petitioner. By these two instruments Smidas chartered the vessel for a period of 4 years, with options to renew for further periods totaling 6 years, for $50,000 per annum. Smidas assumed and agreed to pay all costs of the repairs and reconversion incurred since June 20, 1946, except for 25,000 British pounds sterling which Falkland agreed to pay.

At about the same time that the charter for the *Anglo Norse* was under negotiation, Jahre became convinced, after conferring with the Norwegians associated with him in petitioner, that it would be easier for him to handle petitioner's affairs from Norway if he arranged for independent financing rather than rely upon the large advances which it had been contemplated A. D. M. would make to petitioner. As a consequence, he arranged in petitioner's behalf a seasonal acceptance credit of 300,000 British pounds sterling from Lazard. This credit with Lazard for 300,000 British pounds sterling was negotiated entirely by Jahre in Europe and this action was ratified at a special meeting of the board of directors of petitioner, held in New York City on September 29, 1947. To obtain this line of credit for petitioner, Jahre personally guaranteed the repayment of any funds advanced thereunder to the extent of 50,000 pounds and Lazard was, in effect, given a lien on the sperm oil produced aboard the *Anglo Norse* and upon the insurance taken out upon the cargo of that vessel. Subsequent to

---

[3] Smidas Company, Inc., was an Ohio corporation. The date of its incorporation was February 19, 1945. At the time of its incorporation, Smith acquired 54.5 per cent of its capital stock. The nature of its business was to promote export business of certain technical items. Its income is from commissions and fees.

the acquisition of the original credit on February 11, 1947, the aggregate seasonal acceptance credit was increased by an additional 55,000 pounds, and the entire amount of 355,000 pounds (approximately $1,429,900) was withdrawn by petitioner to help finance the sperm oil expedition. The withdrawals were accomplished through a bank account established with the borrowed funds at Lazard's, and only Jahre had authority to draw on that account. The obligation to Lazard was repaid by petitioner on or about October 23, 1947.

On or about February 21, 1947, a new contract between petitioner as seller and A. D. M. as buyer was drafted and dated as of December 13, 1946. This proposed contract also provided that title to the sperm oil would pass to A. D. M. as the oil was produced by the *Anglo Norse* on the high seas and placed in the tanks of that vessel. This proposed contract was signed by both parties but due to circumstances hereinafter mentioned was mutually canceled and rescinded.

It still remained necessary for the parties to work out some definitive relationship between petitioner and Smidas (the charterer of the *Anglo Norse*) for the conduct of the contemplated sperm oil expedition. When the matter was discussed in Norway, Hans Bull proposed that petitioner enter into a management contract with Smidas, whereby petitioner would manage, finance, and operate the entire expedition without any interference from Smidas. In return, petitioner would be entitled to the entire proceeds from the sale of the oil to A. D. M., except for a certain amount which would be paid to Smidas for the part which it had played in making the venture possible. As a part of this proposal the Norwegian shareholders of petitioner contemplated that petitioner could, and would, itself sell the oil directly to A. D. M. When, however, the latter aspect of the proposal was called to the attention of Quintrell (who was in the United States), he took the position that if petitioner was merely to "manage" the sperm oil expedition, then Smidas (which was the charterer) necessarily was the producer and owner of the oil and had to be the one to enter into a contract with A. D. M. to sell the oil. Accordingly, the sales contract executed as of December 13, 1946, was canceled and rescinded, and two new contracts were executed. One contract, dated March 8, 1947, was between petitioner and Smidas, and the other contract, a sales contract dated May 26, 1947, was between Smidas and A. D. M.

The first contract, dated March 8, 1947, was in the form of a letter from Smidas to petitioner, wherein Smidas proposed and petitioner accepted. Under the terms of this arrangement, petitioner assumed all the obligations of Smidas under the charter party, agreed to furnish or procure for Smidas at least seven killer boats, completely outfit each vessel, hire all necessary personnel, procure adequate insurance,

and pay all expenses necessary or incidental to the conduct of the contemplated expedition. Petitioner also agreed to comply in all respects with the International Whaling Agreement, to take such action as Smidas shall determine to be advisable for the delivery of the oil so produced at New York, and to keep Smidas advised of the actions taken by petitioner and the progress effected. The arrangement then recited that Smidas proposed to enter into a contract to sell to A. D. M. at $320 per long ton all sperm oil produced by the *Anglo Norse* to be delivered at New York on or before March 15, 1948, and that Smidas agreed to pay petitioner—

for your services and for undertaking the burdens, expense and risks herein described the entire balance of the proceeds to be received by us from the sale of the oil produced under your management, which balance shall remain after deducting from such proceeds the sum of (a) $25,000 and (b) the amount of any expenses incurred directly by us in the sale and delivery of such oil.

Petitioner agreed to exonerate Smidas from any liability for any obligation under any charter party relating to any of the vessels—

and also from any liability or obligation for any tax upon the production, delivery and sale of such oil, including any income tax upon our alleged receipt of more than $25,000 of taxable net income from the sale of the oil produced hereunder. * * *

The second contract dated May 26, 1947, between Smidas and A. D. M. was drafted by Quintrell and sent to Jahre in Norway for approval. After the proposed instrument had been approved by Jahre, it was executed in the United States by Smidas and A. D. M. Quintrell signed the contract as vice president for Smidas, and the president of A. D. M., S. M. Archer, signed for A. D. M. The new sales contract, which was dated May 26, 1947, contained essentially the same provisions as the rescinded sales contract dated as of December 13, 1946, previously referred to, except that Smidas was the seller rather than petitioner and that the new contract provided that title to the sperm oil would pass to A. D. M., not as it was produced on the high seas aboard the *Anglo Norse*, but at the time that the sperm oil was delivered to A. D. M. in New York City.[4] This latter change

---

[4] Paragraphs 1 and 3 and parts of paragraphs 2 and 6 of the May 26, 1947, contract are as follows:

1. The Seller warrants that (a) it has chartered the floating factory Anglo Norse for a period extending beyond March 15, 1948; (b) it has employed Spermacet Whaling Co. S. A. to act as the manager of said floating factory and of the expedition or expeditions upon which said vessel is to be engaged during the period ending March 15, 1948; (c) the Seller or its said manager has made necessary arrangements to obtain the use throughout said period of at least seven (7) killer boats to accompany, and be used in connection with the operation of, said floating factory; and (d) said vessels are in suitable condition and properly equipped for the production of about two hundred (200) long tons of sperm oil per day of operation.

2. The Seller will cause said floating factory and killer boats to be sent, on or before May 1, 1947, to whaling grounds off the West Coast of South America or to such other waters as it and its said manager may determine and thereafter to be used primarily

in the sale provisions was made because A. D. M. refused to take title to the oil during the extended period in which it, and the insurance thereon, was subject to a lien in favor of Lazard under the seasonal acceptance credit negotiated by Jahre.

Pursuant to authority from Smidas, Bull negotiated and executed in Norway 7 separate charters for the 7 killer boats which were to accompany the *Anglo Norse* on the sperm oil expedition. Six of these charters were obtained from Norwegian corporations in the Jahre group and the seventh was obtained from Falkland. Neither Smith nor anyone else in the United States played any part in these transactions.

The *Anglo Norse* was reconverted to a factory ship and repaired and reconditioned entirely in Norwegian shipyards for the contemplated sperm oil expedition. All contracts for its reconversion, repairs, and equipment and for catch supplies, deck supplies, provisions, and engineroom supplies to be used on the expedition, were negotiated, executed, and carried out in petitioner's behalf by Norwegians in Norway. Similarly, all officers and all members of the crews of the several vessels (aggregating about 300 men) were Norwegian and were employed pursuant to contracts negotiated in petitioner's behalf in Norway by Jahre or others under his supervision. Apart from the Guaranty Trust account matter hereinafter discussed, the only activity of any kind occurring in the United States with respect to the expenditures of this type made by petitioner related to certain fuel oil purchases. In those instances, Smith, at the direction of petitioner's Norwegian management, merely contacted certain brokers who, at prices acceptable to and confirmed by the Norwegians, secured fuel oil to be delivered to the *Anglo Norse* while it was on the sperm oil expedition off the western coast of South America.

The *Anglo Norse* and the 7 killer boats left Norway on the sperm oil expedition in April 1947. The *Anglo Norse* and one of the killer boats (both of which were owned by Falkland) flew the British flag and were documented under the laws of Great Britain. The other 6 killer boats flew the Norwegian flag and were documented under the laws of Norway. The vessels proceeded directly to the fishing grounds

for the purpose of production of sperm oil until the time when it shall be considered by said manager to be reasonably necessary to discontinue production in order that the oil theretofore produced may be delivered to the Buyer within the time permitted hereby. For purposes of convenience, the aforesaid period is referred to herein as the Period of Production. * * *

3. The Seller hereby agrees to sell, and the Buyer to purchase, upon the terms hereof, all sperm oil which shall be produced by means of said vessels during the Period of Production.

\* \* \* \* \* \* \*

6. * * * The title to the oil shall pass to the Buyer upon the Buyer's payment of seventy-five per cent (75%) of the Seller's provisional invoice therefor in accordance with Section 7 hereof. * * *

off the western coast of South America and there on May 20, 1947, fishing for sperm whales and the producing of sperm oil was commenced. These operations continued until on or about January 4, 1948, at which time the killer boats returned to Norway. During this entire period the vessels were in constant contact with petitioner's management in Norway via shortwave radio and remained under Jahre's supervision.

As a result of the sperm oil expedition there was produced by the *Anglo Norse* 15,357.1508 long tons of sperm oil. A portion of this production was delivered to A. D. M. by the transport *Peik* in October 1947 and the balance by the *Anglo Norse* in January 1948. In this connection the transport *Peik* (which was owned by one of the Norwegian corporations controlled by Jahre) was a private carrier sent by petitioner in September 1947 to the *Anglo Norse* with a load of fuel oil for the expedition. After delivering the fuel oil to the *Anglo Norse* and its supporting vessels, the *Peik* received from the tanks of the floating factory 8,194.8245 long tons of sperm oil and in turn delivered that quantity to A. D. M. in New York on or about October 20, 1947. At such time A. D. M. was authorized by Smidas to pay petitioner the contract price for the sperm oil then delivered, that contract price being $2,622,343.84. Of this amount, A. D. M. paid $1,429,900 directly to Lazard to discharge that bank's lien on the sperm oil for funds advanced to petitioner and, after charging petitioner with one-half of the survey fee paid at the port of entry (or $480), paid the balance of $1,191,963.84 to petitioner which petitioner deposited in its account with the New York Guaranty Trust Company.

The *Anglo Norse* arrived at New York, New York, on or about January 27, 1948, and delivered to A. D. M. 7,162.3263 long tons of sperm oil. At such time A. D. M. was again authorized by Smidas to pay petitioner the contract price for the quantity then delivered, that contract price being $2,291,944.42. After offsetting against this amount one-half of the survey fee paid at the port of entry (or $487.50), A. D. M. paid petitioner $2,287,668.26, leaving a balance due of $3,788.66. Petitioner deposited the amount of $2,287,668.26 in its account with the Guaranty Trust Company of New York. After unloading her cargo of sperm oil the *Anglo Norse* returned to Norway.

In addition to the funds which petitioner borrowed from its shareholders pursuant to the stockholder loan agreement and from Lazard under the seasonal acceptance credit dated February 11, 1947, petitioner obtained loans from the following sources at the following times in financing the sperm oil expedition:

| Source | Amount | Date of loan |
|---|---|---|
| Anders Jahre, et al. | $201, 207. 24 | Aug.  5, 1947 |
| | 36, 217. 30 | Aug. 29, 1947 |
| | 4, 627. 71 | Dec. 30, 1947 |
| | 242, 052. 25 | |
| Smith Division of A. D. M. | 25, 000. 00 | May 20, 1947 |
| | 60, 000. 00 | June 27, 1947 |
| | 50, 000. 00 | July 20, 1947 |
| | 25, 000. 00 | Sept. 17, 1947 |
| | 42, 000. 00 | Sept. 24, 1947 |
| | 202, 000. 00 | |

Of the amount of $242,052.25 loaned by Jahre, et al., $200,000 was repaid by petitioner on November 12, 1947. Of the amount of $202,000 loaned by the Smith Division of A. D. M., the entire amount was repaid on October 27, 1947.

In addition to the funds which petitioner borrowed to finance the sperm oil expedition hereinbefore referred to, petitioner obtained loans from the following sources at the following times for other corporate purposes:

| Source | Amount | Date of loan |
|---|---|---|
| Anders Jahre, et al. | $201, 207. 24 | Apr. 15, 1948 |
| Werner G. Smith | 6, 159. 40 | Mar. 11, 1948 |
| | 79, 000. 00 | Mar. 12, 1948 |
| | 2, 058. 20 | Mar. 17, 1948 |
| | 135, 000. 00 | Mar. 18, 1948 |
| | 222, 217. 60 | |
| Smith Division of A. D. M. | 50, 000. 00 | Mar. 22, 1948 |
| | 30, 000. 00 | Apr. 13, 1948 |
| | 80, 000. 00 | |

Of the amount of $80,000 loaned by the Smith Division of A. D. M., $50,000 was repaid on April 22, 1948.

Soon after its incorporation petitioner established bank accounts at the Den Norse Creditbank of Oslo and Tonsberg, Norway, and at the Guaranty Trust Company of New York in New York City. On petitioner's bank account at the Den Norse Creditbank only Von der Lippe, the petitioner's agent in Norway, was authorized to draw checks. On the petitioner's account at the Guaranty Trust Company either Smith alone or Smith jointly with Jahre or Bull was authorized to sign checks in the name of petitioner. However, soon after the latter account was established, Smith reached an oral understanding with Jahre that, except for small amounts, he would not draw

checks on the Guaranty account except with Jahre's prior knowledge and approval. Smith honored and observed that understanding.

The bank account maintained by petitioner at the Guaranty Trust Company of New York was opened by it on or about February 8, 1947, with a deposit of $125,630.11 and was, at all times pertinent hereto, the only bank account maintained by petitioner in the United States. The deposits to that account consisted, generally speaking, of amounts paid in as Smith's participation in the capital stock and shareholder loans to petitioner, the individual loans to petitioner from Smith or A. D. M., the money paid by A. D. M. for the sperm oil it purchased (except for the amount required to be paid to Lazard as previously stated), and the gross receipts from the operation of the tanker *Jan*,[5] the operation of which was at all times conducted outside of the United States. The payments from that account consisted, in general, of amounts paid at the direction of the Norwegian management to discharge obligations of petitioner requiring payment in United States dollars, payments to or for the personal benefit of petitioner's Norwegian shareholders (such payments being considered loans to those shareholders), repayments of the shareholder loans and of the amounts borrowed from A. D. M., transfers of funds to Norwegian accounts for use by the Norwegian management, and the payment of the amount of $1,828,326.67 for the purchase of the tanker *Jan*.

The average monthly balance as of the end of each month of the account with the Guaranty Trust Company for the fiscal year ended April 30, 1948, was the amount of $326,655.57. The average of petitioner's property, both within and without the United States, for the fiscal year ended April 30, 1948, was the amount of $2,295,826.24.

Petitioner in its return deducted $2,354,977.96 for cost of operations and $1,492,340.76 for repairs. Of the $2,354,977.96, $573,111.98 was charged against its account at the Guaranty Trust Company and the balance was charged to its Tonsberg office or against bank accounts maintained outside of the United States. Of the $1,492,340.76 deducted for repairs, petitioner charged $11,115.02 against its account at the Guaranty Trust Company and the balance was charged to its Tonsberg office or against bank accounts maintained by it outside of the United States. None of petitioner's activity by which such expenditures were created took place in the United States except to the limited extent that Smith participated in some of the fuel oil purchases, as hereinbefore set forth.

At a meeting of the board of directors on December 12, 1946, Smith, in his capacity as treasurer of petitioner, had been authorized not only to draw checks on the Guaranty account but also to "cause books

---

[5] This tanker had been built in Europe, was purchased in Europe, and its operations were at all times conducted outside of the United States. Respondent makes no contention that any income from its operation is taxable here.

of account and financial records to be opened and maintained in accordance with standard accounting practice." Smith was made treasurer because at that time it was contemplated that A. D. M. would finance the sperm oil expedition by advancing petitioner $500,000, plus one-half the contract price of all sperm oil produced in excess of 1,562 long tons.[6] Under such circumstances, Smith could more conveniently handle the financial arrangements with A. D. M. Thereafter, when the Lazard loan was arranged by petitioner's Norwegian management and the requirement of substantial advances from A. D. M. dispensed with, no such necessity existed for Smith to remain as treasurer. While he continued to hold that office as a matter of form, his withdrawals from the Guaranty account were subject to the understanding between Jahre and him previously referred to. Furthermore, Smith did not at any time pertinent hereto establish or maintain books of account for petitioner in the United States or elsewhere, all of petitioner's books of account being maintained at its office in Norway. The only records of petitioner which were received or maintained in the United States during the taxable year were the canceled checks on the Guaranty account, the monthly statements with respect to that account, and some of the bills and invoices paid for in dollars from that account.

During the fiscal year ended April 30, 1948, petitioner's board of directors held meetings in New York City on September 29, 1947, October 2, 1947, January 31, 1948, and February 2, 1948, to discuss and approve or ratify corporate procedures and policies. All such meetings were called in New York City because it better suited the personal convenience of the directors to meet there. While these meetings were the only formal meetings held by petitioner's board of directors, Jahre and Bull, who were two of the three directors, frequently and repeatedly held informal meetings in Europe at which corporate procedures and policies were determined.

Petitioner did not at any time prior to April 30, 1948, have an office in the United States. During that same period it did, however, have an office in Norway in which and from which it directed and managed petitioner's operations. It did not at any time have any United States employees nor was it qualified to do business in any State in the United States. Smith, petitioner's sole officer in the United States, was paid a director's fee of $10,000 for the period prior to April 30, 1948. During this same period Quintrell was paid "the bulk" of $11,000 for his services as an officer and for legal fees.

The arrangements for the delivery of the sperm oil in New York City were handled by Bull in his capacity as broker. He was frequently in the United States attending to other business.

---

[6] On the basis of 15,357 tons of sperm oil actually produced, A. D. M. would have been required by the proposed sales contract to advance to petitioner approximately $2,207,200.

Petitioner, in its return, reported total items of income and deductions as follows:

| Item | Operation of whaling fleet | Operation of tanker *Jan* [7] |
|---|---|---|
| Gross receipts | $4,913,320.76 | $168,723.80 |
| Cost of operations | 2,354,977.96 | 80,060.55 |
| Gross profit | 2,558,342.80 | 88,663.25 |
| Deductions | 1,747,766.42 | 3,775.22 |
| Net income | 810,576.38 | 84,888.03 |

The respondent adjusted the net income of $810,576.38 to $924,979.72, and in the statement attached to the deficiency notice said:

It has been determined that income earned by you as the Spermacet Whaling Co., S. A., during the taxable year ended April 30, 1948, was gross income from sources within the United States as defined by Section 119 (a) (6) of the Internal Revenue Code. Accordingly, you are deemed to be a foreign corporation engaged in a trade or business within the United States as provided in Section 231 (b) of the Internal Revenue Code and are subject to normal tax and surtax in accordance with the provisions of Sections 13 [*sic.* Probably meant 14 (c) (1).] and 15 respectively of the Internal Revenue Code.

During the taxable year ended April 30, 1948, petitioner was not a resident foreign corporation engaged in trade or business within the United States.

### OPINION.

Petitioner does not dispute the correctness of the amount of the net income of $924,979.72 determined by the respondent. It contends, however, that not any of such net income is taxable to it by the United States or, in the alternative, if any amount is taxable, the taxable portion did not exceed $65,804.14.

It is clear that before petitioner can be taxed by the United States upon any part of the net income in question two requirements must be met. First, it must appear that petitioner was a "resident" foreign corporation "engaged in trade or business within the United States" and, second, that it had "gross income from sources within the United States" under section 231 of the Internal Revenue Code of 1939, as amended.[8] This presents a question of fact. *Higgins* v. *Commissioner*, 312 U. S. 212 (1941).

---

[7] See footnote 5, *supra.*

[8] SEC. 231. TAX ON FOREIGN CORPORATIONS.

(a) NONRESIDENT CORPORATIONS.—

\* \* \* \* \* \* \*

(b) RESIDENT CORPORATIONS.—A foreign corporation engaged in trade or business within the United States shall be taxable as provided in section 14 (c) (1) and section 15.

(c) GROSS INCOME.—In the case of a foreign corporation gross income includes only the gross income from sources within the United States.

[NOTE: In 1942, section 231 (b) was amended by section 160 (d) of the Revenue Act of 1942 by deleting the phrase "or having an office or place of business therein" which followed the phrase "within the United States." Section 231 (c) was never amended.]

The question we have will become clearer once we resolve the part played by Smidas in the transaction. As disclosed in our findings, it was Smidas who chartered the boats, contracted with petitioner to manage them, took title to the oil, and made delivery of it to A. D. M. pursuant to a written contract entered into between Smidas and A. D. M. If we read the contracts as they are written, Smidas engaged petitioner to perform services under which petitioner would be rewarded with "the entire balance of the proceeds to be received by us from the sale of the oil produced under your management" in excess of $25,000 and certain expenses to be incurred by Smidas in the sale and delivery of such oil.

Petitioner in its opening statement insisted on the genuineness of Smidas's part in the transaction and insists it (petitioner) was not to be held responsible for the acts of Smidas who, it was claimed, was guided in its action by its own board of directors. It is certainly difficult to accept respondent's argument that Smidas was no more than a strawman, and the part it played in the enterprise was a sham. It was not a corporation organized for tax purposes or, for that matter, for the particular part it played in this transaction. Smidas had been in existence for some time; it had ample assets and was at times engaged in various business activities. As far as we know, it is still in existence. It was reasonably compensated for its activities in this enterprise.

We think Smidas's part in the expedition was vital and cannot be disregarded in determining whether petitioner was engaged in business within the United States. It is true that until the time Jahre contacted the British Government with the view of chartering the *Anglo Norse* from Falkland *for petitioner* it was the intention of all concerned that petitioner would charter the vessels, proceed to the whaling area, catch the whales, produce the oil, and sell the oil to A. D. M., all on the high seas. But when the British Government refused to grant its consent to the chartering on the ground that Panama had not subscribed to the International Whaling Agreement, the entire sperm oil venture was jeopardized. New arrangements had to be made and were made and petitioner had to assume a different role. Smidas became the charterer of the vessels *in its own behalf* and entered into a contract, dated March 8, 1947, with petitioner under which petitioner was to manage the expedition for Smidas and assume the obligations mentioned in our findings for which Smidas agreed to pay petitioner for its services.

We think the chartering of the boats, the March 8, 1947, management contract between petitioner and Smidas, and the sales contract dated May 26, 1947, between Smidas and A. D. M. were all bona fide contracts serving a real business purpose, and were in fact what they appeared to be in form. We do not believe they can be dis-

regarded and petitioner treated as if it were the owner and seller of the oil, notwithstanding a statement appearing in petitioner's initial brief that it had "refrained from making the contention that Smidas, Inc., rather than itself, was the owner and seller of the sperm oil" and, hence, is the one to be held taxable on any gain from the sale.[9]

We think the facts here clearly show that petitioner was not the owner and seller of the oil. It had no contract with A. D. M. for the sale of oil. The oil which petitioner produced was produced for Smidas, and it was Smidas that entered into the contract of sale with A. D. M. Smidas was a separate and independent entity and in no way could it be regarded as if it were petitioner's agent. *Chisholm* v. *Commissioner*, 79 F. 2d 14 (C. A. 2, 1935); *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378 (1935); *Clara M. Tully Trust*, 1 T. C. 611; *Alprosa Watch Corporation*, 11 T. C. 240; *John Junker Spencer*, 19 T. C. 727. Smidas, as charterer of the vessels, entered into a contract with petitioner to manage the expedition for Smidas, for which Smidas agreed to pay petitioner the income here in question. The business in which petitioner was engaged was that of managing the expedition for Smidas, and petitioner's activities which produced the income in question took place almost entirely on the high seas or in Norway.

The activities cited by the respondent as having taken place within the United States are, in our opinion, without substance. He says petitioner had an office in Cleveland, but this was the office of A. D. M. and Smidas and was not petitioner's office. Respondent refers to some services performed by Hans Bull, Quintrell, and Smith on petitioner's behalf within the United States. Hans Bull arranged for the discharge of the oil when it was delivered in New York City. He did this as a broker and was paid a broker's commission. Quintrell is a lawyer and performed some legal services for petitioner. His title as assistant secretary of petitioner was conferred upon him only as a matter of convenience and to enable him to perform certain ministerial acts which are related to the strict professional obligation he owes his client. The acts of Smith in receiving monthly state-

---

[9] In its reply brief, however, petitioner said:

"[R]espondent states that petitioner 'admits on brief that Smidas was nothing more than a straw man and that the transaction was, in effect, a sham.' The petitioner has made no such admission at any time. That characterization of the transaction *was and is* the respondent's, not the petitioner's. As indicated in petitioner's initial brief, the respondent had, in the administrative consideration of the case, repeatedly insisted upon describing Smidas as a 'straw man.' It was in light of that contention by respondent, and for the *sole* purpose of squarely presenting the trade or business and source of income issues, that petitioner finally agreed, at respondent's request, to file a 'no-tax' return in which income and deductions were reflected *as if* petitioner were the owner and seller of the oil. * * *

"The *facts* are set forth in the record—and that record speaks for itself. It not only shows the charters, contracts, and obligations undertaken by Smidas and the substantial business risks assumed by it, but also it demonstrates that petitioner could not, in view of the attitude of the British Government, do any of these things. Furthermore, there is absolutely no warrant in that record for assuming that Smidas was an instrumentality of petitioner or that its acts in the United States were petitioner's acts."

ments or correspondence involving petitioner, or in paying a limited number of obligations requiring payment in American dollars out of a bank account with the Guaranty Trust Company maintained by petitioner, were ministerial and clerical in nature, involving very little exercise of discretion or business judgment necessary to the production of the income in question. The holding of the directors' meetings in New York City solely for the personal convenience of the directors was of no particular consequence. Nor do we think the fact that the whaling enterprise was under the management of petitioner at the time the *Anglo Norse* made a delivery of sperm oil in New York is enough to say petitioner was engaged in trade or business within the United States. As we have already pointed out, the *Anglo Norse* at the time was under charter to Smidas and the oil cargo belonged to Smidas.

We have consistently held that before a taxpayer can be found to be "engaged in trade or business within the United States" it must, during some substantial portion of the taxable year, have been regularly and continuously transacting a substantial portion of its ordinary business in this country.[10] This it did not do.

Upon the entire record, we are convinced that petitioner was not engaged in any substantial, regular, or continuous ordinary business activity in the United States. We hold that petitioner is not a "resident * * * foreign corporation engaged in trade or business within the United States" and is, therefore, not taxable as provided in sections 14 (c) (1) and 15 of the Internal Revenue Code of 1939.

Our disposition of this case makes it unnecessary to decide such questions as where the sale of the oil was consummated or how the profit should be allocated on goods produced outside of the United States and sold within the United States.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

ATKINS, *J.*, dissenting: I find myself unable to agree with the majority in this case. The Supreme Court has repeatedly taken the position that the incidence of taxation depends upon the substance of a transaction. *Gregory* v. *Helvering*, 293 U. S. 465, *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, and *Griffiths* v. *Helvering*, 308 U. S. 355. In the latter case it was stated:

We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss* v. *Bowers*, 281 U. S. 376, 378, 50 S. Ct. 336, 74 L. Ed. 916. And it makes no difference that such "command" may

---

[10] See *European Naval Stores Co., S. A.,* 11 T. C. 127; *Scottish American Investment Co., Ltd.,* 12 T. C. 49; *Linen Thread Co., Ltd.,* 14 T. C. 725; *Jan Casimir Lewenhaupt,* 20 T. C. 151, affirmed per curiam 221 F. 2d 227; and *Consolidated Premium Iron Ores Ltd.,* 28 T. C. 127.

be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. Cf. *Gregory* v. *Helvering*, 293 U. S. 465 * * *

Upon the facts in this case it seems clear that in reality the petitioner conducted the whaling operations and the sale of the oil, and that Smidas was a mere agency or instrumentality used by the petitioner for chartering the *Anglo Norse*, which it could not charter directly. Petitioner assumed all the obligations of Smidas under the charter party, procured the killer boats, outfitted each vessel, hired all necessary personnel, procured the insurance, conducted all the whaling operations, paid all expenses, delivered at least a part of the oil, and directly received the proceeds from the sale of the oil. Whereas in form the contract provided that the petitioner would manage, finance, and operate the expedition for Smidas and receive payment of the entire proceeds from the sale of the oil, except for $25,000 which would be retained by Smidas, in reality it was the petitioner which received all the proceeds from the sale of oil and paid Smidas $25,000 for what appears to have been merely entering into the charter agreement.

All the oil was sold in the United States. Since the delivery and sale of products are among the most important functions of a business for profit, I think it is clear that the petitioner was engaged in trade or business within the United States within the meaning of section 231 (b) of the Internal Revenue Code of 1939, and therefore taxable upon income from sources within the United States. Under this view, it would be necessary to consider the applicability of section 119 (e) (2) of the Code and section 29.119–12 of Regulations 111 in determining how much income the petitioner derived from sources within the United States, but since that is not considered in the majority opinion, it need not be considered here.

TURNER, OPPER, and RAUM, *JJ.*, agree with this dissent.