COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

CONSOLIDATED PREMIUM IRON ORES, LIMITED, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

William R. DALEY and F. Cassie Daley, Respondents.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Cyrus S. EATON, Respondent.

Nos. 13473–13475.

United States Court of Appeals
Sixth Circuit.

April 10, 1959.

Myron C. Baum and Meyer Rothwacks, Dept. of Justice, Washington, D. C., Charles K. Rice, Lee A. Jackson, and A. F. Prescott, Dept. of Justice, Washington, D. C., on brief, for petitioner.

Abe Fortas, Washington, D. C., I. W. Sharp and Robert W. Sharp, Cleveland, Ohio, Milton V. Freeman and Carolyn E. Agger, Washington, D. C., on brief, for respondents.

Before MARTIN and MILLER, Circuit Judges, and CECIL, District Judge.

CECIL, District Judge.

These cases are before the Court on petitions of the Commissioner of Internal Revenue to review a decision of The Tax Court of the United States upon which judgments were entered on July 24, 1957, pursuant to its Findings of Fact and Opinion filed April 23, 1957.

In cases numbered 13,474 in which William R. Daley and F. Cassie Daley are respondents and 13,475, in which Cyrus S. Eaton is respondent, the question presented is:

Were the respondents Eaton and Daley liable individually for income taxes on

the difference between one cent a share paid for 1,437,500 shares of stock of Steep Rock Iron Mines, Limited, by Consolidated Premium Iron Ores, Limited, and delivered to it and the alleged fair market value of said stock.

The petitioner charges that this difference represents compensation to respondents Eaton and Daley for services rendered by them to Steep Rock Iron Mines, Limited.

In case numbered 13,473, in which Consolidated Premium Iron Ores, Limited, is respondent, the question presented is: Did it have a permanent establishment in the United States within the meaning of the Tax Convention and Protocol between the United States and Canada, 56 Stat. 1399, so as to be subject to taxes in the United States.

If Premium did have a permanent establishment in the United States, then the further question arises as to whether or not it was "engaged in trade or business within the United States", in any of the taxable years from 1943 to 1949.

The petitioner concedes that if Eaton and Daley are liable individually for income tax on the difference between the cost and alleged value of 1,437,500 shares of Steep Rock stock as above mentioned, then there would be no tax liability against Premium for such difference in value.

In addition to this alternative liability against Premium on the stock transaction, the petitioner claims that it is liable for other taxes for the taxable years 1943 to 1949.

The Tax Court held that Eaton and Daley were not individually subject to tax on the difference between the cost of the 1,437,500 shares of Steep Rock stock and their alleged value. It further held that Premium, an incorporation of Canada, had no permanent establishment in the United States and was, therefore, not subject to tax in the United States by reason of the Tax Convention and Protocol between the two countries.

The issues presented by these cases are primarily factual. At the outset of the trial in the Tax Court, Mr. Kennedy, for the Commissioner, stated "We think the case is a purely factual one. It can be decided on its facts and it will not be too much of a precedent for other situations." (R. 1b–2b).

The facts are extensive, complicated and important to a proper understanding and determination of the issues involved. Judge Van Fossan, of the Tax Court, made an excellent Findings of Fact with which there is little dispute. Only two findings are claimed to be clearly erroneous. These are findings that Eaton was acting in a representative capacity (28 T.C. 127, 133, 134). Other errors complained of are that the trial judge drew erroneous conclusions and inferences from the facts as found.

The facts are, therefore, virtually undisputed. In order to have a clear understanding of the points involved, reference should be made to the Findings of Fact of the Tax Court. They are reported in Consolidated Premium Iron Ores, Ltd. v. Commissioner of Internal Revenue, 28 T. C. 127, 129.

Briefly stated, the facts are as follows:

Cyrus S. Eaton and Wm. R. Daley are citizens of the United States and at times pertinent to these actions had offices in the Cleveland, Ohio, suite of Otis and Co., at 2000 Terminal Tower of that city.

Otis was engaged in and carried on business as an underwriter and distributor of securities, a dealer in securities and an investment company. It had offices throughout the United States. Daley was its president and he and Eaton were substantial stockholders.

Steep Rock Iron Mines Limited was incorporated under the laws of the Province of Ontario on February 24, 1939. It owned about 7000 acres in the Steep Rock Lake area of Ontario, containing large bodies of high grade iron ore. There were three large deposits of ore under the waters of Steep Rock Lake.

Steep Rock's problem was to secure funds for development of the mine which was an undertaking of great magnitude. The officers of Steep Rock desired to se-

cure financing without giving up control of the property.

Discussions of the officers ultimately led to contact with Eaton and Daley as representatives of Otis and Co.

Eaton and Daley became interested and undertook to arrange financing. There were extended negotiations between Eaton and Daley, Steep Rock's officers and various other persons. Several plans were considered and abandoned and finally a loan of $5,000,000 was arranged with Reconstruction Finance Corporation. To supplement this loan Otis purchased from Steep Rock, $2,250,000 of debenture bonds and 562,500 shares of Steep Rock common stock for $2,025,000. These bonds and shares were marketed to the public. This resulted in a very profitable operation for Otis.

The financing was complicated and involved many details. It cannot be briefly summarized and reference is hereby made to the meticulous Findings of Fact made by the trial judge, 28 T.C. 127, 129.

It was at all times contemplated that a corporation would be formed to act as a sales agency for marketing the product of Steep Rock. Premium Iron Ores, Limited, later changed to Consolidated Premium Iron Ores, Limited, a Canadian corporation, was organized for this purpose on November 14, 1942.

On January 15, 1943, Steep Rock and Premium entered into a sales contract. See Findings of Fact, 28 T.C. at page 137. By agreement of May 27, 1944, between Steep Rock and Cleveland-Cliffs, the latter company agreed to purchase substantially all of the ore mined by Steep Rock. The preamble to this agreement recited that Steep Rock had appointed Premium its exclusive sales agent "and as its agent to negotiate this contract;" that "Premium on behalf of Steep Rock has approached Cliffs in connection with" commitments to purchase certain tonnages of ore from Steep Rock and other items.

Two million shares of Steep Rock common stock had been set aside to be used in the financing of the company.

On February 23, 1943. Steep Rock authorized 562,500 of these to be issued to Otis and 1,437,500 to be issued to Premium at a nominal price. These latter ones are the subject of these actions. Some of these 1,437,500 shares were distributed to satisfy claims for participation in the financing arrangements. 28 T.C. 139.

Finally, Eaton and Daley and their families owned substantially all of the stock of Premium.

■ We are in accord with the findings of the trial judge that Eaton and Daley were acting in a representative capacity and not as individuals in their negotiations concerning the Steep Rock Company and the distribution of its stock. This is a proper inference to be drawn from the evidence and the undisputed facts. We believe these findings were not only not clearly erroneous but were correct.

Daley was president of the Otis company and Eaton was a substantial stockholder of it. They had their offices in the suite occupied by the company. Otis was in the business of marketing securities and of underwriting and financing business projects.

A corporation acts only through its officers, agents and employees. Steep Rock's approach to Eaton and Daley was through Otis. "Promptly thereafter, Sweezey contacted Eaton and discussed the Steep Rock project with him and Daley, as representatives of Otis, and others representing steel companies at a meeting held in Cleveland, Ohio, with the idea of having Otis join Sweezey Securities Limited in some plan to finance the development of the properties of Steep Rock." (Unchallenged Finding, 28 T.C. 131.)

Another unchallenged finding (28 T.C. 132) "Promptly after the termination of the negotiations between Cleveland-Cliffs and Steep Rock, Eaton, at the request of Sweezey, went to Toronto to confer with Hogarth, then president of Steep Rock, and other officers of Steep Rock, *and thereafter Eaton discussed the matter with officers of Otis.*" (Emphasis added.)

The marketing of all of the securities for the financing of Steep Rock was done through Otis.

Counsel for the petitioner attach a great deal of importance to the memorandums of Hogarth and Eaton of July 13, and July 20, 1942, and particularly to the one of July 20. These memorandums set forth a procedure for the financing of Steep Rock so that it could get into the production of iron ore.

In the effort to finance Steep Rock, proposals were made and abandoned. The proposals contained in these documents were never fully performed. For instance, $7,500,000 in first mortgage bonds were not issued. Bonds could not be marketed in Canada.

The provision for 1,875,000 shares to be issued on Eaton's order was increased to 2,000,000 shares and as a matter of fact, no shares were ever issued on his order.

It is significant to note that Daley's name is not mentioned in these letters or memorandums.

Of the 2,000,000 shares, 562,500 were transferred to Otis. 450,000 of these were sold in package deals to stimulate the sale of bonds. As indicated by counsel for petitioner, Otis made a profit of $450,000 on this transaction. Since Eaton and Daley owned virtually all of the stock of Otis, here was substantial and adequate compensation for their efforts.

Counsel for petitioner refer particularly to the statement in the memorandum of July 20, under the heading "Miscellaneous." Here, after enumerating certain things that Mr. Eaton will arrange and provide, the statement continues: "For these services and the services during the past two years in providing without cost to the company exhaustive hydraulic and mining engineering reports and data on diversion of the Seine River and pumping of Steep Rock Lake * * *" etc., "the company will issue upon Mr. C. S. Eaton's order, upon receipt of the proceeds of the bonds, 1,875,000 shares of its common stock."

Mr. Eaton did not personally perform all of the items enumerated in the above paragraph and while they were without cost to Steep Rock in the sense that it was not charged with each item, the various parties involved expected to be paid and were paid with the shares that were set aside to pay for financing.

We do not consider that this statement can be interpreted to mean that Mr. Eaton personally was to be compensated or that issuing shares upon his order meant that they were assigned to him personally. It seems logical to infer from all the facts and the evidence that Mr. Eaton was the agent of Otis for the financing of Steep Rock and that the 2,000,000 shares, 1,875,000 plus an additional 125,000 set aside for the financing, were to be disposed of for that purpose upon his order.

Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731; Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75; Helvering v. Eubank, 311 U.S. 122, 61 S. Ct. 149, 85 L.Ed. 81, are not in point here for the reason that Eaton and Daley were acting in a representative capacity and no shares were delivered to a designee of Eaton and Daley as compensation for services rendered by them.

It was contemplated at all times that the ore of Steep Rock was to be marketed through a sales agency. (Memo. of July 13, 28 T.C. 133.) This finally took the form of a Canadian corporation, Premium Iron Ores, Limited, later changed to Consolidated Premium Iron Ores, Limited, incorporated November 14, 1942. This corporation is the respondent in case No. 13,473 and to it the 1,437,500 shares in question were transferred pursuant to a sales agreement between it and Steep Rock, dated January 15, 1943. "It was understood from the beginning of the negotiations that Steep Rock would arrange for the sales company to have shares of the stock." (Finding of Fact unchallenged, 28 T.C. 134.)

This number of shares transferred to Premium represents the difference between the 2,000,000 set aside for financing and the 562,500 transferred to Otis.

The sales agreement imposed certain obligations upon Premium (Findings of Fact, 28 T.C. 137).

Of the shares transferred to Premium, it was agreed by all parties that Carr was to receive 430,000 for an obligation of Steep Rock to him. From these shares Carr was to compensate Sweezey Securities, Limited, for the services Sweezey had performed in bringing the parties together. There were other purchases and sales of Steep Rock stock by Premium.

Although Eaton and Daley ended up owning substantially all of the Stock of Premium, it does not appear that through it they received 1,437,500 shares of Steep Rock stock, or that they received any number of shares as compensation of services rendered to Steep Rock.

The petitioner argues that since Premium was not incorporated until several months after the so-called contract of July, 1942, and the alleged services were already performed, Eaton and Daley could not have been acting in a representative capacity for Premium.

The finding of the trial court was that they acted in a representative capacity for Otis *or* Premium. As we have already stated, the provisions of the document of July 20, were changed and never fully performed. It is an obvious fallacy to attempt to interpret that document as a contract whereby Eaton and Daley were to be compensated individually.

We merely point out some of the indications that Eaton and Daley were acting in a representative capacity and not as individuals.

Judge Van Fossan has made a clear and comprehensive statement of the issues involved.

We conclude that he was correct in his Findings of Fact and in the inferences and legal conclusions he drew therefrom. The judgments in favor of the respondents, William R. Daley and F. Cassie Daley, in case No. 13,474 and the respondent, Cyrus S. Eaton, in case No. 13,475 are affirmed.

The principal question raised in case No. 13,473, Commissioner of Internal Revenue, Petitioner, v. Consolidated Premium Iron Ores, Limited, Respondent, is whether or not Premium had a permanent establishment in the United States within the meaning of the Tax Convention and Protocol between the United States and Canada.

The petitioner claims that Premium did have such a permanent establishment.

In support of this claim he cites first the application of Premium for a license to do business in Ohio. Although the license was granted on January 18, 1943, and remained in effect until August 14, 1950, annual statements were made by Premium in each of the years 1944 to 1949 inclusive, reporting that it had no assets in Ohio and that it had not transacted any business in Ohio during the previous year. These reports also contained the statement "that its Ohio office was located at 2000 Terminal Tower, Cleveland, Ohio." (28 T.C. 144)

An address at which no assets are held and from which no business is transacted can not in itself contribute much toward a permanent establishment.

Secondly, the petitioner refers to a resolution adopted by the directors of Premium on April 25, 1944, in which approval was given to arrangements previously made for locating "the company's chief place of business in Ohio, at Room 2000 Terminal Tower, Cleveland." This resolution also provided "No arrangement as to expense of said office was completed at this time." (28 T.C. 145) This was made before the Cleveland-Cliffs contract and at a time when it was contemplated that Premium would carry on an extensive business of selling Steep Rock's ore in Cleveland. It did not carry on such selling. This mere reference to an address does not substantiate the petitioner's claim *unless it can be shown by all* of the evidence that it was actually used as a permanent establishment.

A third contention made in support of the petitioner's claim that Premium had a permanent establishment in the United States is based on information

furnished to the Foreign Exchange Control Board of Canada by Mr. Daley in a letter to Mr. Mungovan, president of Premium. In November, 1944, the Royal Bank of Canada submitted an application of Premium to this Board "to use $10,000 for the purpose of opening an account with the Central National Bank of Cleveland, Ohio, to pay expenses in the United States in connection with an office in Cleveland, including rent, clerical help, traveling expenses and engineering and consulting fees." Mr. Daley's letter was dated December 11, 1944, and was in answer to the Board's request for further information. (28 T.C. 145)

This letter was written on a letterhead of "Premium Iron Ores Limited, 80 Richmond Street West, Toronto, Canada." In the heading it had the address "2000 Terminal Tower, Cleveland, 13, Ohio." It also contained a paragraph to which the petitioner attaches great importance. "We should call your attention to the fact that every iron ore company in the country maintains an important office in Cleveland which is the center for the iron and steel trade, and which is the home of the important companies which transport ore."

No money was authorized to be transferred for the establishment of a bank account in Cleveland as requested. "The Control Board authorized disbursement of a specific amount for expenses incurred and $300 per month for future like expenses." (28 T.C. 146) Payment of expenses was made by a series of checks payable to Otis beginning in May, 1945, and credited to miscellaneous income on Otis' books. (28 T.C. 146)

Mr. Daley was president of Otis, but was neither director, officer or employee of Premium.

The analysis of this made by Judge Van Fossan in his opinion, is in point. (28 T.C. 152) "Premium paid Otis & Co. for 'rent and services' of a Cleveland office, but the commissioner does not argue strenuously that Premium really had any employees there. The services were actually performed for Steep Rock, and reimbursement was originally sought from it. The payment by Premium for services actually not rendered to it does not establish an office of Premium in Cleveland."

The petitioner claims further that the use of stationery containing the address "2000 Terminal Tower, Cleveland, 13, Ohio," in writing four letters by Mr. Daley, supports its claim of a permanent establishment in Cleveland.

These letterheads (Joint Exhibits 59 GGG, 60 HHH, 62 GGG and 75 WWW R. 370a, 371a, 375a and 393a) contain a principal heading "Premium Iron Ores Limited/ 80 Richmond Street West/ Toronto, Canada"/ and a subheading "2000 Terminal Tower/ Cleveland 13, Ohio."/ It is obvious that Premium could be addressed at 2000 Terminal Tower, Cleveland, but the use of four such letterheads is not sufficient to make a permanent establishment.

Finally, it is claimed that Premium paid for office expenses and services in Cleveland. This was discussed in connection with the application to the Control Board for authority to pay such expenses.

The petitioner seeks to show that Premium had as much of an establishment in Cleveland as it had in Toronto. This is beside the point. It was a Canadian corporation. Its principal place of business, however large or small, was there. The officers and directors were there and so were its banking facilities and bookkeeping operations. The question is, what was in Cleveland?

The petitioner has combed the record to find evidence of permanent establishment. He has come up with some isolated instances of what might be termed admissions in documents and letters that tend to show an office or establishment in Cleveland. More significant, however, is the total absence of so many usual and ordinary characteristics of permanency of establishment.

The trial judge summed up this absence of essential characteristics in his opinion (28 T.C. 151) "Premium had no real office in the United States; no officers, directors or employees here; no bank account

or books of account; no telephone listing; its name did not appear on any door or office; it had no employee or agent established here who had 'general authority to contract for his employer or principal,' such authorized agent being one of the definitive tests of a 'permanent establishment' under the treaty."

The one occasion when Mr. Daley desired to bind Premium to an important contract he telephoned the president in Toronto for authority.

After considering all of the evidence, the trial judge made his findings of fact and concluded therefrom that Premium did not have a "permanent establishment" in the United States within the meaning of the Tax Convention and Protocol between the United States and Canada. Counsel for the petitioner claim that this conclusion is erroneous and is a result of drawing improper inferences from the undisputed facts.

■ It is not our function as a reviewing court to consider the facts de novo and draw our conclusions. Our question is whether or not the Tax Court's findings of fact and its inferences and conclusions drawn therefrom are clearly erroneous.

Counsel for the respondent contends that this Court cannot draw inferences and conclusions independently from those drawn by the Tax Court unless there is lacking a substantial basis for such conclusions and inferences. This claim is based on the authority of Commissioner of Internal Revenue v. Scottish American Investment Co., Ltd., 323 U.S. 119, 65 S.Ct. 169, 89 L.Ed. 113.

This case was decided in 1944 and since then what is now 26 U.S.C. § 7482 (Internal Revenue Code of 1954), was amended in 1948 by adding to the words "shall have exclusive jurisdiction to review the decisions of the Tax Court" the phrase, "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury."

This amendment was made specifically to abrogate the rule of Dobson v. Com-

missioner of Internal Revenue, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248. Sen. Rep. No. 1559, 80th Cong., 2d Sess. (1948); 93 Cong. Rec. A 3281 (1947); 94 Cong. Rec. 8500–01 (1948). We are of the opinion that the amendment had a similar effect on the rule announced in Commissioner of Internal Revenue v. Scottish American Investment Co. supra, which was decided a short time after Dobson v. Commissioner of Internal Revenue and was just another application of the same rule.

In Rich v. Pappas, 6 Cir., 229 F.2d 308, decided Feb. 9, 1956, this Court said at page 313, "The District Judge was authorized to draw all reasonable inferences from these uncontradicted facts. Such inferences unless clearly erroneous, are controlling on this review. United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746; United States v. Cold Metal Process Co., 6 Cir., 164 F.2d 754, 755."

This question arose again in our court in Dixie Sand and Gravel Corporation v. Holland, 6 Cir., 255 F.2d 304, decided May 1, 1958. Here, we followed the rule of the Rich case.

We are aware, as was stated by the Court of Appeals of the First Circuit that, "There is a singular lack of unanimity on this point, not only between, but within, individual circuits," Texas Co. v. R. O'Brien & Co., 1 Cir., 242 F.2d 526, 529, Note 1.

There is such a conflict in our own circuit. For the contrary view see E. H. Sheldon & Co. v. Commissioner of Internal Revenue, 6 Cir., 214 F.2d 655; Letcher County v. DeFoe, 6 Cir., 151 F.2d 987; Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389; Yunker v. Commissioner of Internal Revenue, 6 Cir., 256 F.2d 130, decided May 1, 1958.

In view of the position taken by this Court in the Rich and Dixie Sand and Gravel cases supported by the U. S. Gypsum case, all above cited, we hold that the facts found by the Tax Court and the inferences and conclusions drawn therefrom are controlling on this review unless clearly erroneous.

Considering all of the evidence taken at the trial, we conclude that the inferences and conclusions drawn from the undisputed facts are not clearly erroneous. We do not, therefore, attempt to substitute an independent judgment of ours for that of the trial judge.

Judge Van Fossan has written a very excellently reasoned opinion based on the law and the facts. We are in agreement with the conclusions reached and the authorities cited by him and, therefore, the judgment in favor of Premium should be, and is, hereby affirmed.